MARSHALL v CONSUMERS POWER COMPANY

1. CONSTITUTIONAL LAW—STATES—COURTS—RIGHTS UNDER FEDERAL
    LAW—ENFORCEMENT.

    Litigants may enforce rights pursuant to Federal law in state
    courts unless the United States Constitution or Congress has,
    expressly or impliedly, given a Federal court exclusive jurisdici-
    ton over the subject matter (US Const, art VI, Am X).

2. COURTS—STATE COURTS—JURISDICTION—NUCLEAR PLANTS—NONRA-
    DIOLOGICAL HAZARDS—FEDERAL PREEMPTION—STATUTES.

    State courts may consider whether operation of a nuclear power
    plant will create steam, fog and icing in the winter and, if so,
    whether the effects constitute a hazard to a plaintiff; Federal
    court jurisdiction is mandated for all matters which deal with
    dangerous radiological hazards at a nuclear plant, but state
    action regarding nonradiological matters incident to construc-
    tion and operation of the plant is not preempted (42 USC
    2021[b], 2021[c], 2021[k]).

3. STATES—REGULATIONS—ATOMIC ENERGY COMMISSION—OBSTRUC-
    TIONS—PREEMPTION.

    A Federal atomic energy commission regulation supersedes a
    state regulation which stands as an obstacle to compliance with
    it; however, to be superseded, the obstruction of the state
    regulation must be nearly absolute where the state is exercis-
    ing a traditional police power in requiring compliance.

4. COURTS—STATES—JURISDICTION—REVIEW—NUCLEAR PLANTS—EN-
    VIRONMENTAL IMPACT—STATUTES—PREEMPTION.

    A state court review of the environmental impact of a proposed
    nuclear power plant is not preempted by Federal law where the
    Federal atomic energy commission has, pursuant to the Na-

REFERENCES FOR POINTS IN HEADNOTES
[1] 16 Am Jur 2d, Constitutional Law §§ 27, 28.
[2–4] 6 Am Jur 2d, Atomic Energy § 45.
[5, 9] 58 Am Jur 2d, Nuisances §§ 6–10.
    61 Am Jur 2d, Pollution Control §§ 11–14.
[6, 8] 58 Am Jur 2d, Nuisances § 152.
[7] 73 Am Jur 2d, Summary Judgment §§ 12–19.

tional Environmental Policy Act of 1969, already considered the environmental impact of the plant and state requirements to abate a nuisance at the plant would be legitimate absent a situation where those requirements would make construction of the plant impossible (42 USC 4321 *et seq.*).

5. Nuisance—Environmental Protection Act—Hazards—Nuclear Plant—Pollution—Impairment of Natural Resources—Destruction of Natural Resources—Statutes.

A complaint to stop construction of a pressurized water nuclear power plant because operation of the plant will fog the air and cause ice to form on roads sounds only in nuisance; the environmental protection act provides for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction and fogging of the air and icing of roads cannot, consistent with the purposes of the act, be considered pollution, impairment, or destruction of any natural resource (MCLA 691.1202).

6. Equity—Nuisance—Injunctions—Anticipated Injury—Anticipated Nuisance.

Equity will not enjoin an injury which is merely anticipated nor interfere where an apprehended nuisance is doubtful, contingent, conjectural or problematical; a bare possibility of nuisance or a mere fear or apprehension that injury will result is not enough; however, an injunction may issue to prevent a threatened or anticipated nuisance which will necessarily result from the contemplated act where the nuisance is a practically certain or strongly probable result or a natural or inevitable consequence.

7. Judgment—Summary Judgment—Motions—Pleadings—Legal Sufficiency.

The validity of a motion for summary judgment based solely on the grounds that the opposing party has failed to state a cause of action is to be tested by the pleadings alone; the motion tests the legal, not factual, sufficiency of the complaint and the facts pleaded are viewed in the light most favorable to plaintiff.

8. Nuisance—Nuisance at Law—Nuisance Per Se—Nuisance in Fact—Nuisance Per Accidents—Words and Phrases.

A nuisance at law or a nuisance per se is an act, occupation, or structure which is a nuisance at all times and under any circumstances regardless of location or surroundings; it is distinguished from a nuisance in fact or a nuisance *per acci-*

*dents,* which is that which becomes a nuisance by reason of circumstances and surroundings.

9. NUISANCE—NUISANCE AT LAW—NUISANCE IN FACT—HAZARDS FROM NUCLEAR PLANT—PLEADING.

A complaint did not state facts sufficient to show that construction of a proposed nuclear power plant would constitute either a nuisance at law or in fact where the plant would violate no law or ordinance if built, and it is yet unclear whether the plant will in fact be built.

Appeal from Midland, James R. Rood, J. Submitted May 14, 1975, at Lansing. (Docket No. 21045.) Decided October 27, 1975. Leave to appeal applied for.

Complaint by Wendell H. Marshall against Consumers Power Company for a declaratory judgment that construction of a pressurized water nuclear power plant would constitute a nuisance and for money damages resulting from such nuisance. Defendant's motions for accelerated judgment and summary judgment granted. Plaintiff appeals. Affirmed.

*William J. Ginster,* for plaintiff.

*Smith & Brooker, P. C. (Paul W. Koval,* of counsel), for defendant.

Before: QUINN, P. J., and BRONSON and N. J. KAUFMAN, JJ.

N. J. KAUFMAN, J. This appeal involves an attempt by plaintiff, a resident of Midland County, to stop the construction by defendant, Consumers Power, of a pressurized water nuclear power plant on the south shore of the Tittabawassee River, one and one-eighth miles from plaintiff's residence. In the nearly seven years since Consumers Power applied to the Atomic Energy Commission (AEC)

for a construction permit, the proposed plant has been the subject of lengthy AEC hearings, two law suits now pending in Federal court and the instant action. Our review of the trial court's holding requires us to inquire into concerns basic to our Federal system of government. We must determine the division of rights, interests and responsibilities between state government and Federal government in the vitally important and rapidly evolving realm of environmental protection.

On January 15, 1969 Consumers Power filed with the AEC an application for a construction permit. Pursuant to AEC procedures, hearings were held on the application in Midland, Michigan before an Atomic Safety and Licensing Board. This board is a unit of the AEC and was composed of technical and legal personnel drawn from outside the AEC staff. See 10 CFR § 2.1 *et seq.* A number of organizations were granted permission to intervene. One of these was the "Mapleton Intervenors", of which plaintiff was a member. Plaintiff also filed a limited appearance in opposition to the issuance of a construction permit.

Initially, pursuant to AEC regulations, the hearing was limited to concerns of health and safety pertaining only to radiological matters, and nonradiological matters were excluded. However, on the date that the hearing was to conclude the United States Court of Appeals for the District of Columbia held, in the landmark case of *Calvert Cliffs' Coordinating Committee v AEC,* 146 US App DC 33; 449 F2d 1109 (1971), that the AEC regulations which excluded environmental issues from this type of hearing did not comply with the National Environmental Policy Act of 1969 (NEPA), 42 USC 4321 *et seq.* This decision was not challenged by the AEC, and, as a result, the board held two more

weeks of hearings at which the power plant's environmental impact was studied. On December 14, 1972, the Atomic Safety and Licensing Board recommended that the requested construction permit be issued. On the next day, the AEC issued the permit. This issuance was appealed by the intervenors to the Atomic Safety and Licensing Appeal Board.

On May 24, 1972, prior to the decision of the safety and licensing board, plaintiff and a number of others filed a suit in the United States District Court for the Eastern District of Michigan, Northern Division, *Aeschliman v AEC* (File No. 3202). This suit, which has not yet been decided, sought a declaratory judgment based on the alleged inadequacy of the safety and licensing board hearings and on the alleged failure of the board to consider the evidence presented by the Mapleton Intervenors.

Plaintiff, on January 17, 1973, filed an action in Midland County Circuit Court, but later voluntarily dismissed it without prejudice and with costs to defendant. He then filed the instant action in Jackson County Circuit Court on March 28, 1973. Defendant moved for a change of venue of this case and, on July 31, 1973, the court transferred the cause to Midland County.

After this case was filed, the AEC's safety and licensing appeal board affirmed the decision to issue the construction permit. This affirmance is currently on appeal to the United States Circuit Court of Appeals for the District of Columbia (D.C. Cir. No. 73-1776).

Plaintiff's complaint sought, in its first count, a declaration of rights that defendant's proposed power plant would constitute a "private and/or public nuisance" and in its second count, money

damages of $750,000. He contended that the operation of defendant's power plant would violate the Michigan environmental protection act, 1970 PA 127, MCLA 691.1201 *et seq.;* MSA 14.528(201) *et seq.,* and would constitute a common law nuisance against which he asked relief pursuant to GCR 1963, 521.6.

The allegations on which he founded his complaint were:

"6) That in constructing and operating its proposed nuclear Units No. 1 and No. 2 in this location and area, a threatened or anticipated private and/or public nuisance will result to a practical certainty or probable result or a natural or inevitable consequence in the following particulars:

"6A. That the operation of the proposed cooling pond and towers interacting with the prevailing meterological *[sic]* conditions at this site in the winter will necessarily result in creation of steam fog and icing; which will to a practical certainty or as a natural or inevitable consequence invade plaintiff's premises; thereby adversely affecting plaintiff's vested personal and property rights, and his lawful rights incidental thereto.

"6B. That dangerous or hazardous vehicular driving conditions will necessarily be created in winter by the operation of defendant's proposed nuclear plant; in that fogging, interference with visibility, and slippery and treacherous driving conditions from creation of ice will necessarily result from the operation of said nuclear plant under all the circumstances and conditions prevailing to a meterological *[sic]* and scientific certainty or as a natural or inevitable consequence of same.

"6C. That plaintiff's premises will necessarily be subjected to accumulation [of] ice on occasions in the winter time under all the conditions and circumstances prevailing to a meterological *[sic]* and scientific certainty or as a natural or inevitable consequence of the operation of defendant's nuclear plant.

"6D. That the operation of defendant's nuclear plant would jeopardize and/or aggravate plaintiff's health;

would cause him to become depressed *(e.g.* especially where the emergency core cooling system planned to be installed in close proximity to his premises is of unproven workability; and the results of a possible nuclear accident so catastrophic as to give rise to anxiety and mental suffering; and further, where he has no private insurance coverage on his premises in the event of a nuclear accident by reason of the nuclear exclusion clause in his insurance policy); would impair the marketability of his property, and result in a depreciation of the value thereof, and in a diminution in the rental value thereof; would materially interfere with the plaintiff's normal use and enjoyment of his property; would result in annoyance, inconvenience, or discomfort.

"6E. That the operation of the proposed nuclear power plant to a certainty and/or probability will leave plaintiff with no private insurance coverage on his premises in the event of a nuclear accident by reason of the standard nuclear exclusion clause in his insurance policy, and plaintiff will suffer deprivation of a vested personal property right and due process of law by reason thereof.

"6F. That the emergency core cooling system planned to be installed in such proposed nuclear units is of unproven workability, and the results of a possible nuclear accident so catastrophic that the siting and location of the said plant is a private and/or public nuisance."

Defendant moved for an accelerated judgment, GCR 1963, 116, as to plaintiff's first count on four grounds: (1) that the court lacked jurisdiction of the subject matter because it had been preempted by the Federal government (GCR 1963, 116.2); (2) that the matter was res judicata; (3) that plaintiff was equitably estopped from suing; (4) that plaintiff had made an election of remedies which precluded his bringing the action. Defendant moved for summary judgment on count two on the ground that plaintiff had failed to state a claim

upon which relief could be granted, GCR 1963, 117.2(1).

After hearings and filing of briefs, the trial court granted both motions. In an extensive and detailed opinion it held that the Federal government had preempted the field of regulation. No holding was rendered on defendant's three other grounds. The court also found that plaintiff's second count presented no actionable claim because plaintiff had failed to allege facts from which the court might hold defendant's nuclear power plant a nuisance. The court held that plaintiff had not alleged facts which tended to show that the plant, if built, would be either a nuisance per se or a nuisance *per accidens* and that plaintiff had demonstrated no injury on which damages could be based.

## I

The doctrine of Federal preemption has its roots in the supremacy clause of the Constitution, US Const, art VI. The supremacy of Federal law is counterbalanced by the Tenth Amendment, which reserves to the states those powers not specifically consigned to the Federal government or specifically forbidden to the states. US Const, Am X. Where the Federal government has prempted an area of jurisdiction, state governments are prohibited from legislating or regulating. Where preemption exists, however, state courts will not always be prevented from acting. A litigant may still enforce rights pursuant to the Federal law in state courts unless the Constitution or Congress has, expressly or impliedly, given a Federal court exclusive jurisdiction over the subject matter. *Mondou v New York, N H & H R Co,* 223 US 1; 32 S Ct 169; 56 L Ed 327 (1912), *Claflin v Houseman,* 93 US 130; 23 L Ed 833 (1876). See Hart and Wech-

sler, *The Federal Courts and The Federal System* (2d ed), pp 427–438. Thus, we must determine whether Congress has preempted states from legislating or regulating the subject matter of the instant case, and, if it has, whether it has also vested exclusive jurisdiction of that subject matter in the Federal court system.

Preemption may occur in a number of contexts. Congress may expressly indicate that the authority conferred by it is exclusive. This indication may be manifested by statutory language, *Campbell v Hussey,* 368 US 297; 82 S Ct 327; 7 L Ed 2d 299 (1961), or by legislative history, *Rice v Santa Fe Elevator Corp,* 331 US 218; 67 S Ct 1146; 91 L Ed 1447 (1947). Preemption may arise from an actual conflict between Federal and state regulations where compliance with both is a "physical impossibility". *Florida Lime and Avocado Growers, Inc v Paul,* 373 US 132, 142–143; 83 S Ct 1210; 10 L Ed 2d 248 (1963).

Where there has been neither an express intention by Congress to preempt a subject matter nor an inevitable Federal-state conflict, a court may still interpret the Federal scheme as implying preemption. Where courts have found that Congress intended to preclude dual regulation, a number of factors have been significant: (1) the statute and its legislative history; (2) the pervasiveness of the Federal regulatory scheme as authorized and directed by the statute and as executed by the Federal administrative agency; (3) the nature of the subject matter regulated and the extent uniformity of regulation is required; (4) whether, in a particular case, the state law represents an obstacle to the accomplishment and execution of Congress' objectives in enacting the Federal law. *Northern States Power Co v Minnesota,* 447 F2d

1143, 1146–47 (CA 8, 1971), *aff'd* by memorandum decision, 405 US 1035; 92 S Ct 1307; 31 L Ed 2d 576 (1972). Where a Federal administrative agency has been given a broad grant of regulatory power, preemption may be found even in the absence of the agency's full exercise of that power. *San Diego Bldg Trades Council v Garmon,* 359 US 236; 79 S Ct 773; 3 L Ed 2d 775 (1959), (National Labor Relations Board), *Napier v Atlantic Coast Line R Co,* 272 US 605; 47 S Ct 207; 71 L Ed 432 (1926), (Interstate Commerce Commission).

Here, in finding that Federal law preempts state consideration of plaintiff's complaint, the court stressed three factors: the pervasiveness of the Federal scheme of regulating atomic energy, the need for uniformity of regulation, and the NEPA-mandated consideration of environmental impact by the AEC. The court stated:

"Every state could, conceivably, have a different set of regulations and a different approach to the problem which could only result in the creation of very conflicting conditions which the Atomic Energy Act and the decisions of the courts have sought to avoid. * * * [I]t appears to this Court that there are no interests or rights which the Michigan Environmental Act is designed to cover which are not already fully protected by the Atomic Energy Act and the National Environmental Act. The acts of Congress have preempted all of these items which the Michigan Environmental Act could possibly cover."

Having found preemption of the subject matter, the court also held that Congress had placed exclusive jurisdiction of the area in the Federal courts. The trial court cited 28 USC 2342:

"The [Federal circuit] Court of Appeals has *exclusive*

*jurisdiction to enjoin, set aside, suspend* (in whole or in part), or to determine the validity of—

\* \* \*

"(4) all final orders of the Atomic Energy Commission made reviewable by section 2239 of title 42." (Emphasis supplied.)

We agree that this provision mandates Federal court jurisdiction for all those matters related to atomic power plants which are exclusively in the Federal realm. We do not, however, agree with the trial court that all of the concerns raised by plaintiff's complaint are subject to Federal preemption. We find that this state is preempted from regulating, and this Court from adjudicating, those matters which deal with dangerous radioactive hazards. Specifically, we hold that we are barred from considering plaintiff's allegations concerning the workability of the emergency core cooling system of defendant's plant and the possibility of nuclear accident.

We find that we are not prevented from considering plaintiff's allegations of nonradiological hazards from the plant, *viz.,* the creation and effects of steam, fog and icing in the winter from the operation of the plant's cooling pond. We hold that we are not preempted from considering these issues only as they are founded on common law nuisance theory. We render no decision on the effect of Federal law on law suits based on the Michigan Environmental Protection Act because, as we will detail below, we affirm the trial court's holding that plaintiff has not presented a cause of action under that statute. Nor do we render a decision as to whether a state court could enjoin the construction of an AEC licensed facility because we find plaintiff's complaint contained no specific request for injunctive relief.

Our holding that the Federal government preempts state action concerning radiological, but not nonradiological matters is founded on the 1959 amendments to § 2021 of the Atomic Energy Act, Act of September 23, 1959, Pub L 86-373 § 1, 73 Stat 688 *amending* 42 USC 2021. As originally conceived, Federal regulation over atomic energy appeared to be complete. Congress, in enacting that act, found in § 2012 that:

"(c) The processing and utilization of source, byproduct, and special nuclear material affect interstate and foreign commerce and must be regulated in the national interest.

\* \* \*

"(e) Source and special nuclear material, production facilities, and utilization facilities are affected with the public interest, and regulation by the United States of the production and utilization of atomic energy and of the facilities used in connection therewith is necessary in the national interest to assure the common defense and security and to protect the health and safety of the public.

"(f) The necessity for protection against possible interstate damage occurring from the operation of facilities for the production or utilization of source or special nuclear material places the operation of those facilities in interstate commerce for the purposes of this chapter." 42 USC § 2012.

Based on the original act, a strong case could be made that states had no role in the field of atomic energy. However, in 1959, Congress added provisions which delineated the respective roles of Federal and state governments. The 1959 amendments to the Atomic Energy Act offered states a significant role in regulating certain aspects of nuclear energy. In 42 USC 2021(b), the Congress authorized states and the AEC to enter into "turnover

agreements" by which a state would assume regulatory authority over "(1) byproduct materials; (2) source materials; (3) special nuclear materials in quantities not sufficient to form a critical mass". The promulgation of subsection (b) was prompted by a belief that atomic technology had reached a point where state agencies could be trained to regulate certain less dangerous atomic activities. Safeguards had been perfected so that uniform Federal regulation would no longer be necessary to prevent nuclear accidents. See 1959 US Code, Cong and Admin News, p 2879.

However, in subsection (c) of § 2021 Congress forbade the AEC from turning over to the states regulation of:

"(1) the construction and operation of any production or utilization facility;

"(2) the export from or import into the United States of byproduct, source, or special nuclear material, or of any production or utilization facility;

"(3) the disposal into the ocean or sea of byproduct, source, or special nuclear waste materials as defined in regulations or orders of the Commission;

"(4) the disposal of such other byproduct, source, or special nuclear material as the Commission determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the Commission." 42 USC 2021(c).

In doing so, Congress was defining an area that required exclusive Federal control.

As a further expression of state authority, Congress promulgated subsection (k) of § 2021, which, we find, makes manifest the radiological/nonradiological dichotomy. Congress provided:

"Nothing in this section shall be construed to affect the authority of any State or local agency to regulate

activities for purposes *other than protection against radiation hazards."* 42 USC 2021(k). (Emphasis supplied.)

The division of powers between Federal and state governments in § 2021, thus, parallels the Constitutional delineation. In subsection (c), certain exclusive powers are given to the Federal government and subsection (b) provides for concurrent powers. The Tenth Amendment reservation of all other powers to the states is found in subsection (k). As the Joint Congressional Committee notes demonstrate, Congress was restating the long-recognized state responsibility to assure through its police powers the health, safety, and welfare of its citizens. *Sligh v Kirkwood,* 237 US 52; 35 S Ct 501; 59 L Ed 835 (1915).

The Committee stated:

"This subsection [k] is intended to make it clear that the bill does not impair the State authority to regulate activities of AEC licensees for the manifold health, safety, and economic purposes other than radiation protection." 1959 US Code, Cong and Admin News, p 2882.

Further, it stated:

"Licensing and regulation of *more dangerous activities—such as nuclear reactors—*will remain the exclusive responsibility of the Commission." *Id* at 2879. (Emphasis supplied.)

Congress, thus, recognized the need for expertise and uniformity of regulation with regard to the handling of nuclear materials sufficient to form a critical mass, whose potential danger is clear. This potential danger and lack of expertise by state authorities required Federal preemption. Congress authorized the turnover to states of those less-hazardous aspects of nuclear power which state

agencies might be trained tŏ regulate.[1] It also was careful not to impinge on state authority over nonradiological problems resulting from nuclear plant operation. Commentators have placed in this category such matters as site selection and zoning,[2] local pollution,[3] building and equipment codes on nonradiation machinery and working conditions of plant employees.[4] All such concerns are intricately related to the construction and operation of nuclear plants, but all have, historically, been left to state regulation.[5]

This radiological/nonradiological dichotomy was recently reaffirmed in two landmark cases, *North-*

---

[1] For the constitutional underpinnings of the turnover agreements, *see* Engdahl, *State Power Over Plowshare: the Constitutional Framework,* 14 Atom Energy LF 243 (1973). The author notes "cogent arguments * * * in defense of a decisive state policy role". *Id* at 264.

[2] Tarlock, Tippy and Francis, *Environmental Regulation of Power Plant Siting: Existing and Proposed Institutions,* 45 S Cal L Rev 502, 523–539 (1972). Note, *State Regulation of Power Plant Siting,* 47 Ind LJ 742 (1972). Hazleton, *Public Policy for Controlling the Environment,* 48 J Urb L 631, 654–656 (1971), Lemov, *State and Local Control Over the Location of Nuclear Reactors Under the Atomic Energy Act of 1954,* 39 NYU L Rev 1008 (1964). Some 26 states require that a certificate of convenience be obtained from a state agency prior to construction. This results in appeals by environmental groups of public utilities commission decisions on such certificates. *See e.g., Northern California Assn to Preserve Bodega Head and Harbor, Inc v Public Utilities Commn,* 61 Cal 2d 126; 37 Cal Rptr 432; 390 P2d 200 (1964). Michigan utilities are not immune from zoning ordinances. *Detroit Edison Co v Wixom,* 10 Mich App 218; 159 NW2d 230 (1968), *rev'd on other grounds* 382 Mich 673; 172 NW2d 382 (1969).

[3] *See* Note, *State Environmental Protection Legislation and the Commerce Clause,* 87 Harv L Rev 1762 (1974), Note, *Federal and State Responsibilities in the Environmental Control of Nuclear Power Plants,* 2 NYU Rev of L & S C 20 (1972) [hereinafter "Responsibilities"].

[4] Estep and Adelman, *State Control of Radiation Hazards: An Intergovernmental Relations Problem,* 60 Mich L Rev 41, 58–63 (1961). If a state regulation stood as an obstacle to compliance with a Federal regulation, the specific state requirement would be suspended, even though its purpose is different from that of the AEC regulation. The obstruction, however, must be nearly absolute where the state is exercising a traditional police power. *Huron Portland Cement Co v Detroit,* 362 US 440; 80 S Ct 813; 4 L Ed 2d 852 (1960).

[5] Estep and Adelman, fn 4 *supra,* pp 58–63.

*ern States Power Co v Minnesota,* 447 F2d 1143
(CA 8, 1971), *aff'd* by memorandum decision, 405
US 1035; 92 S Ct 1307; 31 L Ed 2d 576 (1972), and
*Calvert Cliffs' Coordinating Committee v AEC,* 146
US App DC 33; 449 F2d 1109 (1971). In *Northern
States,* the court held that a Minnesota statute
which regulated radioactive waste releases from
nuclear plants, was unconstitutional. The court
found neither specific language requiring preemp-
tion nor physical impossibility of dual regulation.
Instead, it opined that the whole tone of the 1959
amendments demonstrated a congressional intent
to preempt. The court noted that, as Minnesota
had conceded:

"[r]adioactive discharges from nuclear power plants
[do] not fall within any of the three categories enumer-
ated in § 2021(b) over which AEC authority may be
relinquished by means of * * * turnover agreements."
447 F2d at 1148.

Rather, the court found the release of nuclear
effluents to be a matter involved in the "construc-
tion and operation" of nuclear plants, a concern
over which § 2021(c) prohibits the AEC from dis-
continuing its authority. It reasoned further that
if, prior to the 1959 amendments, states had con-
current power to regulate, it would have been
unnecessary for Congress to affirmatively give
states authority in specific areas by means of
turnover agreements.

The trial court relied on *Northern States* as
requiring preemption over nonradiological matters
in the instant case. We disagree. We read *North-
ern States* as holding that state control over con-
struction and operation is prohibited only as to
radiation hazards. First, the only issue before the
court in that case was "whether the United States

Government has the sole authority under the doctrine of preemption to regulate *radioactive waste releases* from nuclear power plants to the exclusion of the states". 447 F2d at 1144. (Emphasis supplied.) It made no decision as to regulation of nonradioactive emissions. Specifically, the court held that " * * * Congress intended federal occupancy of regulations over all *radiation hazards* except where jurisdiction was expressly ceded to the states * * * ". *Id* at 1150. (Emphasis supplied.)

Second, the *Northern States* opinion itself stressed the retention of state regulation over "activities *for purposes other than protection against radiation hazards". Id* at 1149. (Emphasis in original.) The court stated:

"The only logically acceptable reason for inclusion of subsection (k) within § 2021 was to make it clear that Congress was not, by subsection (c) of the 1959 amendment, in any way further limiting the power of the states to regulate activities, *other than radiation hazards,* associated with those areas over which the AEC was forbidden by that subsection to relinquish its control." *Id* at 1150. (Emphasis in original.)

We do not, as did the trial court, read the *Northern States* opinion as holding that regulatory authority of nonradiological matters is part of a nuclear plant's "construction and operation" as that term is used in the § 2021(c)(1) expression of exclusive AEC control. Both the *Northern States* opinion and AEC regulations demonstrate that there is exclusive AEC control over "construction and operation" only as to radiation hazards, not as to nonradiological matters. In *Northern States,* the court cited an analysis of § 2021(c)(1) made during hearings on the 1959 amendments. This analysis made it clear that the purpose of the "construction

and operation" clause was to "retain under Commission regulatory control the operation of the *reactor".* 447 F2d at 1149, fn 6. (Emphasis supplied.) The AEC regulations, in describing the scope of "construction and operation", speak only in terms of the storage, handling and discharge of radioactive materials. 10 CFR § 150.15.[6]

In *Calvert Cliffs',* the court explicitly recognized the ability of states to set standards dealing with nonradiological pollution. It stated that, in enacting the National Environmental Policy Act of 1969 (NEPA), 42 USC 4321 *et seq.,* "Congress was surely cognizant of Federal, state and local agencies 'authorized to develop and enforce environmental standards' ". 449 F2d at 1123. The court held that, under § 104 of the NEPA, the AEC was required, at a minimum, to make sure that prospective licensees complied with standards set by states and made enforceable by Federal law. *Id* at 1124. As an example, the court pointed to the Water Quality Improvement Act of 1970, 33 USC 1151 *et seq.* (WQIA). This act prohibits Federal licensing agencies from granting a license until the applicant has received certification from a state agency that compliance with applicable water quality standards is reasonably assured.[7]

[6] The Federal Environmental Protection Agency has, since *Northern States,* taken over control of setting applicable standards for radioactive effluent discharge outside plant site boundaries. Pres Reorg Plan #3 of 1970, 3 CFR 1072 (1966–1970 Compilation). This merely represents a change in Federal agency authority over an exclusively Federal area.

[7] Section 104 of NEPA requires:

"Nothing in Section 102 or 103 shall in any way affect the specific statutory obligations of any Federal agency (1) to comply with *criteria or standards of environmental quality,* (2) to coordinate or consult with any other Federal of State agency, or (3) to act, or refrain from acting contingent upon the recommendations or certification of any other Federal or State agency." 83 Stat 854; 42 USC 4334. (Emphasis supplied.) Such "criteria or standards" include those set by states under such Federal laws as WQIA. *See also* Note, *Water Quality Standards in Private Nuisance Actions,* 79 Yale LJ 102 (1969).

Similarly, the 1970 Clean Air Act Amendments to the Air Quality Act of 1967, act of December 31, 1970, Pub L 91-604, 84 Stat 1676 *et seq.,* amending 42 USC 1857 *et seq.,* recognizes the states' ability to regulate emissions. The act encourages "the enactment of * * * uniform State and local laws relating to the prevention and control of air pollution" on an interstate level. 42 USC 1857a(a). On an interstate level, states are asked to make recommendations leading to Federal standards for ambient and secondary air pollution. The act gives primary responsibility for implementation of these interstate standards to state governments, not to the Federal government. 42 USC 1857c-2(a), c-5.[8] The Federal domain in matters covered by the Clean Air Act has been held not to be exclusive or preemptive of state legislation. *Clean Air Coordinating Committee v Roth-Adam Fuel Co,* 465 F2d 323 (CA 7, 1972), *cert den* 409 US 1117; 93 S Ct 895; 34 L Ed 2d 701 (1973), *reh den* 410 US 959; 93 S Ct 1412; 35 L Ed 2d 694 (1973), *Houston Compressed Steel Corp v Texas,* 456 SW2d 768 (1970). Further, a state may impose pollution control requirements which are more strict than those specified by the Federal plan. *Indiana & Michigan Electric Co v Environmental Protection Agency,* 509 F2d 839 (CA 7, 1975), *St Joe Minerals Corp v Environmental Protection Agency,* 508 F2d 743 (CA 3, 1975). Both the WQIA and the Clean Air Act deal with interstate pollution. The fact that the Federal government has given state and local governments significant responsibilities in setting *interstate* standards and the responsibility to enforce those standards makes even more clear the

---

[8] *See also* Prevention, Control, and Abatement of Environmental Pollution at Federal Facilities, Exec Order No 11752, (December 19, 1973), 3 CFR 380; 38 FR 34793, § 4.

responsibility of the states to regulate *intrastate* pollution.[9]

In addition to the *Northern States* case, the trial court founded its holding of preemption on the theory that the interests of the state and its citizens were protected by the National Environmental Policy Act. Because the AEC had, pursuant to NEPA, already considered the environmental impact of the plant, a state court review would not only be fruitless but would result in a multiplicity of state regulations that would defeat the purpose of the Atomic Energy Act. We disagree for several reasons: (1) the differing nature of state court and Federal agency deliberations; (2) the necessity for state courts to provide a forum for the adjudication of state common law rights; (3) the fact that a license granted by a Federal agency is a permit, not a Federal order to build; (4) the authority of United States Supreme Court cases where the Court upheld state court actions which effectively blocked or penalized a party exercising a Federally granted license.

First, the parties, the rights adjudicated, the interests alleged, and the basic nature of the forum are so different in a state court from what they are in AEC administrative hearings that an

---

[9] Compare *Ohio v Wyandotte Chemicals Corp*, 401 US 493; 91 S Ct 1005; 28 L Ed 2d 256 (1971), with *Illinois v Milwaukee*, 406 US 91; 92 S Ct 1385; 31 L Ed 2d 712 (1972). In *Wyandotte Chemical*, the Supreme Court refused original jurisdiction of a suit to abate interstate pollution. It felt that a state court had as compelling a claim to adjudicate the controversy and that the case would be decided under the common law of nuisance. The Court stressed the value of "close supervision of the technical performance of local industries" by state courts. 401 US at 505.

In *Illinois v Milwaukee*, however, the Court held that Federal common law governed such suits. The Court distinguished *Wyandotte Chemical* in a cryptic footnote, claiming that *Wyandotte* had been concerned with state nuisance law, not Federal common law. 406 US at 102, fn 3. In any case, Federal common law would be enforced with reference to state standards. *Id* at 107.

adjudication by one should not always prevent the other from deciding a similar question. Plaintiff and defendant were not the principal parties at the AEC hearings. Their dispute was not the principal subject of the hearings. Plaintiff was not forced to intervene but did so in an admirable attempt to protect the interests of his community. He was asserting a general Federal right at the AEC hearings, not a specific state right. In the instant case, plaintiff is alleging a state common law right to be free from an alleged nuisance. The NEPA provides no such right. The only right that the NEPA gave plaintiff at the AEC hearing was a procedural one: to have the AEC fully disclose the environmental impact of a proposed project. *Upper Pecos Association v Stans,* 452 F2d 1233, 1236 (CA 10, 1971). His only remedy is against the AEC, not against defendant. Because a state court and a Federal agency have clearly different, not concurrent, jurisdictions, this is not like those cases which require a plaintiff to elect between agency or court action, or which involve the doctrine of primary jurisdiction. *White Lake Improvement Assn v City of Whitehall,* 22 Mich App 262; 177 NW2d 473 (1970), 3 Davis, *Administrative Law Treatise,* § 19.01, p 5.

Further, each forum will conduct a different balancing process. A state court must make a case-by-case determination based on a number of factors. It must examine such factors as the character of a defendant's industry and the character, volume, time and duration of the alleged nuisance. *Smith v Western Wayne County Conservation Assn, 380 Mich 526; 158 NW2d 463 (1968). In each case, the only concern is the adjudication of a state common law right.*

The AEC, on the other hand, cannot be accu-

rately termed neutral. The agency was established to fulfill the often conflicting goals of both regulating and promoting nuclear energy. Only recently has it attempted to divide the two functions into separate agency units.[10] The tendency of regulatory agencies to be "captured" by those whom they regulate is well known.[11] In the agency balancing process, state and local interests will be but one factor, and they will have to compete against concerns vital to national and international policy. Commentators have opined that, in AEC determinations, such Federal concerns as the promotion of nuclear power and the national need for more sources of energy will get greater precedence than such local concerns as icing or fogging.[12] These basic differences between state court and Federal agency action belie defendant's claim that plaintiff has made an election of remedies or has created multiplicity of actions. Where different rights, obligations, remedies and jurisdictions are involved, such theories are inapplicable.

Second, without recourse to a state court, a private party will have no ability to make sure that his state rights will be adequately protected by his state government. Where a state intervenes in the agency process, a private party has no way of requiring the state to defend his specific interest and no ability to seek judicial review of the quality of state involvement.[13] If the state does not inter-

[10] Energy Reorg Act of 1974, Pub L No 93-438 (October 11, 1974).

[11] Jaffe, *Judicial Control of Administrative Action,* (Little, Brown & Co ed 1965), pp 11–14.

[12] Sax, *The (Unhappy) Truth About NEPA,* 26 Okla L Rev 239 (1973), Coggins, *The Environmentalist's View of AEC's "Judicial" Function: A Reply to Messrs Doub* 15 Atom Energy LJ 176 (1973).

[13] The State of Michigan intervened in the AEC hearing but not in the instant case. It was also an intervenor in the *Northern States* case. An agency or court ruling may cause a utility company to make changes in its building plans. Because these changes will inevitably

vene, a private party could not force it to do so. A suit for mandamus to force such intervention would be fruitless, inasmuch as a plaintiff could show no mandatory duty to intervene. Without a state court forum, a private citizen would be forced to raise the state interest by appealing the AEC ruling.

Such an appeal is a difficult task. Because the NEPA contains no enforcement provision, a challenge to an AEC decision must be made under chapter 7 of Title 5 of the United States Code (formerly the Administrative Procedure Act). See 5 USC 702. The prescribed scope of review under that chapter is the substantial evidence rule. 5 USC 706(2)(e). Under this rule, reviewing courts will defer to an agency determination so long as, upon an examination of the whole record, there is substantial evidence upon which the agency could reasonably base its decision. Judicial deference to AEC expertise may make this review a narrow one.[14]

Third, and most importantly, the license granted by the AEC is merely a permit to construct a power plant, not a Federal order to do so. Therefore, a state which, pursuant to its Atomic Energy Act power to regulate nonradioactive hazards, stopped a power company from operating until it met reasonable state standards or abated a nuisance under state law could not be frustrating a Federal mandate.

In this light, the case of *Huron Portland Cement Co v Detroit,* 362 US 440; 80 S Ct 813; 4 L Ed 2d 852 (1960), is cogent precedent. In that case, Hu-

be paid for by state consumers, the state government should take an active interest in all such hearings and litigations.

[14] Note, *Responsibilities,* fn 3, *supra,* pp 40–41.

ron Portland argued that a Federal law providing for the inspection and regulation of ships' boilers preempted Detroit from enforcing an ordinance governing smoke emissions. Notwithstanding the facts that compliance by Huron Portland would require it to make extensive structural alterations in its ships' boilers and that the ordinance affected ships on navigable, interstate waters, the Supreme Court upheld the ordinance application. The Court found no overlap between the Federal and local laws. The Federal law was designed to assure safe equipment while the Detroit city ordinance sought to eliminate air pollution, a matter of state and local concern.

The Court in *Huron Portland Cement* stressed its policy of not "seeking out conflicts between state and Federal regulations where none *clearly* exists". 362 US at 446. (Emphasis supplied.) Thus, the mere chance that some remedies might impinge on Federal preeminence in an area should not oust a state court from acting where a valid state police power is involved.[15] Similarly here, exclusive AEC regulation pursuant to § 2021(c) is designed to assure the safe operation of nuclear reactors and the safe handling of dangerous radioactive materials. This does not overlap with the exercise of state judicial power to insure the welfare of its citizens.

Even more in point are two cases where the Supreme Court affirmed state court enforcement of the state common law even though that enforcement effectively defeated the exercise of Federally authorized licenses. *Radio Station WOW v Johnson*, 326 US 120; 65 S Ct 1475; 89 L Ed 2092 (1945), (fraud claim), and *Regents of the University*

[15] *See, e.g., Williams v Superior Court In and For County of Pima,* 108 Ariz 154; 494 P2d 26 (1972), *State v Republic Steel Corp,* 38 Ohio Misc 43; 311 NE2d 911 (1973).

*System of Georgia v Carroll,* 338 US 586; 70 S Ct 370; 94 L Ed 363 (1950), (contractual claim enforced). *Cf. Allen B Dumont Laboratories v Carroll,* 184 F2d 153 (CA 3, 1950), *cert den* 340 US 929; 71 S Ct 490; 95 L Ed 670 (1951). See Engdahl, *Preemptive Capability of Federal Power,* 45 Colo L Rev 51, 68–76 (1973). The Court spoke in terms of "fair accommodation between State and federal authority". 326 US at 132. In both cases, the Court stressed the fact that a Federal broadcasting license was a permit to serve, not a duty to do so. As here, the Court found that Federal licensees must conform to state laws which did not actually impinge on the licensing system.[16]

Where, however, a local ordinance stands in direct conflict to a Federal regulation, the local law is preempted. In *City of Burbank v Lockheed Air Terminal Inc,* 411 US 624; 93 S Ct 1854; 36 L Ed 2d 547 (1973), the City of Burbank passed an ordinance which made it unlawful for jet aircraft to take off between 11 p.m. and 7 a.m. the next day. This was an attempt to exercise police powers to reduce noise. The Supreme Court held the attempt to have been preempted by the Federal Aviation Act of 1958, 49 USC 1301 *et seq. Burbank* was relied on by an Illinois appellate court in *Village of Bensenville v City of Chicago,* 16 Ill App 3d 733; 306 NE2d 562 (1973), a case whose reason-

---

[16] In *Radio Station WOW v Johnson,* 326 US 120; 65 S Ct 1475; 89 L Ed 2092 (1945), the state court ordered a lease necessary to operate the radio station set aside on the ground of fraud. It also set aside the broadcast license on this ground and ordered the station to do all things necessary to return the license to the lessor-original owner. Only the latter holding was reversed because it impinged on the Federal licensing scheme and on the licensee's freedom to take part in the licensing process.

In *Regents v Carroll, supra,* 338 US 586; 70 S Ct 370; 94 L Ed 363 (1950), the FCC conditioned the renewal of plaintiff's license on its breaking a contract with a third party. When it did, the third party sued and won a judgment. The Court upheld this judgment.

ing the trial court adopted. We find both cases inapposite here for two reasons. First, in *Burbank* and *Bensenville,* the local scheme could literally not coexist with Federal regulation. Management of airspace was in the exclusive realm of the Federal Aviation Agency. If localities made flight impossible, they would directly impinge on Federal authority to set routes and times for commercial carriers. Here a finding of nonradiological nuisance would not impinge on AEC regulation of radioactive hazards. If the state did attempt to declare all power plants nuisances per se and exclude them, a *Burbank*-type case would occur.

Second, the Federal Aviation Act, unlike the Atomic Energy Act, left no room for any state regulation. While the Atomic Energy Act, in § 2021(k), specifically allowed state regulation of nonradiation hazards, the Federal Aviation Act, § 611(d), provided only for "consultation" with states as the FAA deemed appropriate.

The fact that, under the NEPA, a nuclear plant's environmental impact is a matter of concern to both Federal and state governments does not limit state action. Where, as here, coordinate state and Federal efforts exist within a complementary administrative and governmental framework and where both have the same objectives, the case for Federal preemption is not strong. See *e.g., New York State Dept of Social Services v Dublino,* 413 US 405; 93 S Ct 2507; 37 L Ed 2d 688 (1973), *Mobil Oil Corp v Attorney General,* 361 Mass 401; 280 NE2d 406 (1972). This is especially so where the state role is a traditional exercise of its police power. *FPC v Panhandle Eastern Pipe Line Co,* 337 US 498, 512–513; 69 S Ct 1251; 93 L Ed 1499 (1949), *Quinn v Bd of Standards and Appeals of the City of New York,* 78 Misc 2d 559; 357 NYS2d 762 (1974).

Finally, while we sympathize with the trial court's fear that allowing state action here will cause conflict between a variety of state standards and AEC regulations, we feel that the potential for such conflict is inherent in our Federal system. As such, the system has developed ways of dealing with such conflict. The doctrines of comity and Federal abstention are two examples. Ultimately, the US Supreme Court may be the final arbiter.

The choice between diverse and uniform solutions is always a difficult one. The very magnitude and complexity of the energy crisis may require a number of different solutions. This is especially so where two of our most pressing concerns, the need for alternate sources of energy and the need to preserve the environment, clash. A uniform national energy policy may be necessary, but it could never be applied with uniformity. States may adopt different solutions to their own needs and, in that way, become "experimental laboratories". Where a broad, Federal scheme is established, it is important to allow room for state regulation by which such local factors as topography, demography and meteorology may be considered.

The Atomic Energy Act has allowed for such state action for the health, safety, and welfare of its citizens. Our Court would be remiss if it denied Michigan citizens the ability to enforce Michigan common law. Specifically, if it found that a nuisance did exist, a court could, if there were no remedy at law, exercise its equitable powers and require defendant to establish measures to abate the nuisance, given current technology. If such measures made the construction of a nuclear plant impossible, they could not be required. In such a case, the Federal interest would prevent state action from absolutely prohibiting the construction

of nuclear power plants within its boundaries. Short of such a situation, state required abatement procedures would be legitimate.

## II

Having decided that we can hear the instant controversy, we turn to plaintiff's specific claims. Plaintiff brought his action for a declaration of rights under both the Michigan Environmental Protection Act (MEPA) and common law nuisance theory. The trial court held that plaintiff had not stated a cause of action under the MEPA. we agree.

The MEPA provides "for the protection of the air, water and other natural resources and the public trust therein from pollution, impairment or destruction". MCLA 691.1202; MSA 14.528(202). While the act's protections encompass many areas of common law nuisance, we find that plaintiff's complaint sounds only in nuisance. The fogging of the air and icing of roads cannot, consistent with the purposes of MEPA, be considered "pollution, impairment or destruction" of any natural resource.

We also agree with the trial court's disposition of plaintiff's complaint for a declaration of rights that defendant's plant would constitute a common law nuisance. The court held:

"The Court does not believe that the Declaratory Judgment Act, or G.C.R. 521.1, gives the Plaintiff the right to a declaratory judgment under the facts of this case. If this Court were to determine that at some time in the future a nuisance was likely to occur, it is not clear to this Court how this would benefit the Plaintiff or how it would protect his rights or determine his future course of action. Further action would be necessary at a later time when the plant was actually

completed and placed in operation in order to deter-
mine whether or not, in fact, because of the manner in
which the plant was being operated that a nuisance had
been created."

The trial court, thus, held that plaintiff had
failed to allege facts sufficient to constitute a
present or definite future nuisance. As the Su-
preme Court stated in *Falkner v Brookfield,* 368
Mich 17, 23; 117 NW2d 125 (1962):

> "[e]quity will not enjoin an injury which is merely
> anticipated nor interfere where an apprehended nui-
> sance is doubtful, contingent, conjectural or problemati-
> cal. A bare possibility of nuisance or a mere fear or
> apprehension that injury will result is not enough. On
> the other hand, an injunction may issue to prevent a
> *threatened or anticipated nuisance which will necessar-
> ily result from the contemplated act, where the nui-
> sance is a practically certain or strongly probable result
> or a natural or inevitable consequence."* (Emphasis
> supplied.)

The validity of a summary judgment motion
based solely on the grounds that the opposing
party has failed to state a cause of action is to be
tested by the pleadings alone. *Cooke Contracting
Co v Dept of State Highways #2,* 55 Mich App
479; 223 NW2d 15 (1974). The motion tests the
legal, not factual, sufficiency of the complaint and
the facts pleaded are viewed in the light most
favorable to plaintiff. *Van Liere v State Highway
Dept,* 59 Mich App 133; 229 NW2d 369 (1975).
Viewing plaintiff's complaint in this light, we are
convinced that he did not state facts sufficient to
show that the building of defendant's plant would
necessarily or inevitably create either a nuisance
per se or *per accidens.* A "nuisance at law" or
"nuisance per se" is an act, occupation, or struc-

ture which is a nuisance at all times and under any circumstances, regardless of location or surroundings, as distinguished from a "nuisance in fact" or "nuisance *per accidens*", which is that which becomes a nuisance by reason of circumstances and surroundings. *Bluemer v Saginaw Central Oil & Gas Service, Inc,* 356 Mich 399; 97 NW2d 90 (1959).

Because defendant's plant, if built, would violate no law or ordinance, it is not a nuisance per se. As the trial court stated, it is yet unclear whether the plant will, in fact, be built. The Federal court appeal from the AEC's issuance of a construction permit is still pending. The issuance might be reversed or its conditions changed. As such, the eventual construction of defendant's plant, not to mention its possible effect, is too uncertain to provide a basis for a declaratory judgment that the plant would be a nuisance *per accidens.*

## III

With regard to plaintiff's claim for damages, we are in agreement with the court's determination that plaintiff had failed to state a cause of action. We adopt the court's reasoning:

"This Court cannot apprehend how the Plaintiff could submit an issue of damages to a jury, * * * until such time as he can demonstrate that he has suffered some damage. It does not now appear with any degree of certainty that this plant will, in fact, be completed, or, that if completed, it will, of necessity, damage the Plaintiff."

Plaintiff merely alleged damages he would suffer if defendant's plant were built. He alleged no present damages capable of recovery.

Affirmed. No costs, a public question being involved.