**PACIFIC LEGAL FOUNDATION, a California Nonprofit Corporation, et al., Plaintiffs-Appellees,**

v.

**STATE ENERGY RESOURCES CONSERVATION & DEVELOPMENT COMMISSION, a state agency, et al., Defendants-Appellants.**

**Natural Resources Defense Council, Inc., et al., Defendants-Intervenors-Appellants.**

**PACIFIC GAS AND ELECTRIC CO. and Southern California Edison Co., Plaintiffs-Appellees,**

v.

**STATE ENERGY RESOURCES CONSERVATION & DEVELOPMENT COMMISSION, a state agency, et al., Defendants-Appellants.**

**Natural Resources Defense Council, Inc., et al., Defendants-Intervenors-Appellants.**

Nos. 79–3365, 79–3382, 80–4265 and 80–4273.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1980.

Decided Oct. 7, 1981.

Rehearing and Rehearing En Banc Denied Jan. 20, 1982.

Laurence H. Tribe, Cambridge, Mass., Roger Beers, Michael Jencks, Kathryn Burkett Dickson, Antonio Rossmann, San Francisco, Cal., William M. Chamberlain, Dian Grueneich, Sacramento, Cal., for appellants.

Ralph Cavanagh, Natural Resources Defense Council, San Francisco, Cal., for intervenors-appellants.

Raymond M. Momboise, Washington, D. C., argued, for Pacific Legal Foundation et al.; Ronald A. Zumbrun, Sacramento, Cal., on brief.

John R. McDonough, Laurence F. Jay, Ball, Hunt, Hart, Brown & Baerwitz, Beverly Hills, Cal., for Pacific Gas & Elec., et al.

Robert Rodecker, Gen. Counsel, Charleston, Va., for amicus curiae State of Va.

John J. McMahon, Deputy Atty. Gen., Boise, Idaho, for amicus curiae State of Idaho.

Bension D. Scotch, Asst. Atty. Gen., Montpelier, Vt., for amicus curiae State of Vt.

J. Mark Davis, Deputy Atty. Gen., Little Rock, Ark., for amicus curiae State of Ark.

Francis S. Wright, Asst. Atty. Gen., EPA, Boston, Mass., for amicus curiae State of Mass.

Tang S. Hong, Deputy Atty. Gen., Honolulu, Hawaii, for amicus curiae State of Hawaii.

A. Rodman Johnson, Deputy Gen. Counsel, Topeka, Kan., for amicus curiae State of Kan.

Harvey S. Price, Inc., Eugene R. Fidell, LeBoeuf, Lamb, Leiby & McRae, Washington, D. C., for amicus curiae Atomic Indus. Forum, Inc.

Tyrone C. Fahner, Atty. Gen., George William Wolff, Asst. Atty. Gen., Chief, Environmental Control Div., Chicago, Ill., for amicus curiae State of Ill.

Joseph B. Knotts, Jr., Debevoise & Liberman, Washington, D. C., for amicus curiae Edison Elec. Institute.

Jancie E. Kerr, San Francisco, Cal., for amicus curiae Public Utilities Com'n of Cal.

Frank W. Ostrander, Jr., Asst. Atty. Gen., Salem, Or., for amicus curiae State of Or.

Before FLETCHER and FERGUSON, Circuit Judges, and FITZGERALD,[*] District Judge.

FLETCHER, Circuit Judge:

These are consolidated appeals from two district court decisions, 489 F.Supp. 699, 472 F.Supp. 191, invalidating portions of California's Warren-Alquist Act. The Warren-Alquist Act regulates all electric plants in California and imposes a moratorium on the construction of new nuclear plants. The courts below held that insofar as the challenged provisions regulate nuclear plants, they are preempted by the federal Atomic Energy Act, 42 U.S.C. §§ 2011–2282 (1976 & Supp. III 1979).

[*] The Honorable James M. Fitzgerald, United States District Judge for the District of Alaska, sitting by designation.

We find that on the records before us, only two of the challenged provisions are ripe for review: the moratorium provision and the requirement that utilities submit three alternate sites for their proposed plants. On the merits, we hold that the Atomic Energy Act does not preempt state laws enacted for purposes other than protection against radiation hazards. Because the moratorium provision and the three-site requirement were enacted for purposes other than protection against radiation hazards, we conclude that they are not preempted.

I

BACKGROUND

A. *The Warren-Alquist Act and the Nuclear Laws*

The Warren-Alquist State Energy Resources Conservation and Development Act, Cal.Pub.Res.Code §§ 25000–25986 (West 1977 & Supp. 1980), commonly known as the Warren-Alquist Act, was enacted by California in 1974. According to the legislative findings and policies set forth in the Act, it was adopted in furtherance of the state's responsibility as perceived by the legislature to ensure a reliable source of electrical energy, and to that end to require coordination of energy research and regulation at the state level. *Id.* §§ 25001–25007.

In keeping with this objective, the legislature established a five-member State Energy Resources Conservation and Development Commission (the Energy Commission)

to carry out the necessary research and regulation. *Id.* § 25200. The Energy Commission, defendant-appellant in these cases,[1] has broad authority over energy planning and forecasting, conservation, resource management, research and development, and the regulation of power plants. The present actions challenge a number of the Warren-Alquist Act's provisions authorizing the Energy Commission to regulate the construction and operation of new nuclear power plants.

California's system of regulating power plants is similar to that employed by a number of other states.[2] In brief, the construction or modification of any power plant, nuclear or non-nuclear, is conditioned upon the Energy Commission's approval, or "certification," of both the site and the proposed plant. *Id.* § 25500. To obtain certification, utilities must follow a two-step procedure.

First, any utility planning to construct a power plant must at an early stage submit a "notice of intention" containing information regarding the need for the power plant, the proposed design, the location of alternate sites, and the relative merits of the different sites. *Id.* §§ 25502, 25504. During this phase of the certification process, the focus is on determining site suitability and general conformance of the proposed plant with long-term energy needs, and health, safety and environmental standards. Each notice of intention must contain at least three alternate sites, only two of which may be near the coast. *Id.* § 25503.[3] The Energy Commission reviews

1. The individual members of the Energy Commission are also defendants-appellants in these cases, as are four environmental groups that intervened below: the Natural Resources Defense Council, the Environmental Defense Fund, the Sierra Club, and Californians for Nuclear Safeguards. The Energy Commission, its individual members, and the environmental groups will collectively be referred to as "the Energy Commission."

2. Twenty-three states filed *amicus* briefs and statements of interest comparing their regulatory schemes to that of California.

3. Section 25503 provides that:

> Each notice of intention to file an application shall contain at least three alternative sites and related facilities, at least one of which shall not be located in whole or in part in the coastal zone. In addition, the alternative sites and related electrical facilities may be proposed from an inventory of sites which have previously been approved by the commission in a notice of intent or may be proposed from sites previously examined.

This section implements the concept of "site banking": if more than one of the proposed sites is found to be acceptable, the unused sites are to be "banked" by the Energy Commission and made available to other utilities wishing to build power plants. The "site banking" concept is apparently unique to California.

the information submitted by the applicant, consults with other agencies, holds hearings, and makes a variety of findings based on its analysis of the data it has gathered. *Id.* §§ 25505–25516.5.[4] The notice of intention may be approved only if the Energy Commission finds that at least two of the proposed sites are acceptable, or that one site is acceptable and a good-faith effort to find an alternate has been made. *Id.* § 25516.

Before beginning the actual construction of a power plant, a utility must apply to the Energy Commission for certification. *Id.* § 25517. The application must contain detailed information about the plant,[5] and the Energy Commission is again directed to review the information and hold hearings. *Id.* §§ 25519–25521. An environmental impact statement is prepared. Local agencies are asked to comment on such matters as the design of the proposed power plant, architectural and aesthetic features, access to roads, and public use of land surrounding the proposed plant. The California Public Utilities Commission is asked to make recommendations regarding the rate structure and economic reliability of the proposed plant, and comments are solicited from other agencies and the public. *Id.* § 25519. The Energy Commission then issues a written decision containing findings similar to those required at the notice-of-intention stage,[6] including specification as to how the plant is to be designed and operated in order to protect health, safety, and environmental quality. *Id.* § 25523. As a condition of certification, the Energy Commission may require the utility to obtain development rights to property surrounding the plant so as to maintain population densities at a safe level. *Id.* § 25528. The Energy Commission is also directed to monitor certified plants once they become operational. *Id.* § 25532.

For the most part, this regulatory scheme applies to power plants of all types.[7] In 1976, however, the California legislature added several provisions to the Warren-Alquist Act that are applicable only to nuclear plants. *Id.* §§ 25524.1, 25524.2, 25524.3. These provisions, known as the Nuclear Laws, impose a moratorium on the certification of any new nuclear plants until the Energy Commission makes certain findings and submits them to the California legislature for approval. Section 25524.1(a) prohibits the certification of nuclear plants requiring fuel reprocessing until the Energy Commission finds that a federally approved method of fuel reprocessing exists; section 25524.2 prohibits the certification of all types of nuclear plants until the Energy Commission finds that a federally approved method of disposing of nuclear wastes exists; and section 25524.3 prohibits the certification of all types of nuclear plants until the Energy Commission has completed and submitted to the legislature a study on the

---

4. The Energy Commission is required to issue findings with respect to the proposed power plant's conformity with projected power needs and applicable land use laws, *id.* § 25514(a), and with respect to the plant's safety and reliability, taking into account proposed emergency systems, safety precautions, plans for handling fuels, features to account for seismic hazards, and methods of controlling population density in areas surrounding power plants, *id.* §§ 25511, 25514(e). The Energy Commission may also specify modifications to the power plant's design, construction, or location. *Id.* § 25514(e).

5. The application is to contain a description of the proposed power plant's design, construction, and operation; safety and reliability information; detailed information about the site; a specification of the fuel to be used; projections of the fuel costs and generating costs; the location of proposed power lines; and any other information the Energy Commission may require. *Id.* § 25520.

6. The findings must address the proposed power plant's compliance with land use, health, safety, environmental, and other standards established by the Energy Commission; compliance with applicable laws; efficiency of operation; and conformity with projected power needs. *Id.* §§ 25216.3, 25402(d), 25523.

7. Two of the sections discussed above contain provisions which apply specifically to nuclear plants. Section 25511 requires the submission of information on methods of preventing the diversion of nuclear fuels, and section 25528 provides that the safe level of population density surrounding nuclear plants will generally be that established by the Nuclear Regulatory Commission.

feasibility of undergrounding and berm containment.[8] The Nuclear Laws also require the Energy Commission to determine, on a case-by-case basis, whether facilities are available to store a proposed nuclear plant's spent fuel rods. *Id.* § 25524.1(b). The Nuclear Laws direct the Energy Commission to continue processing notices of intention and applications for certification of new nuclear plants, but until the requisite findings are made the plants cannot be certified and construction cannot begin. *Id.* §§ 25524.1(c), 25524.2(d), 25524.3(c); *see id.* §§ 25500, 25517.

### B. The PLF Case

The first of the two cases before us, *Pacific Legal Foundation v. State Energy Resources Conservation & Development Commission (PLF)*, involves only one provision of the Warren-Alquist Act: section 25524.2, imposing a moratorium on new nuclear plants until the Energy Commission finds that a method of waste disposal exists.[9] The suit was originally brought by a number of plaintiffs, who challenged all three Nuclear Laws.[10] The court below granted summary judgment for plaintiff Robert Thornberry, but denied the summary judgment motions of the other plaintiffs on the ground that they had failed to show particularized injuries sufficient to give them standing.[11]

Thornberry, a nuclear engineer, was hired by San Diego Gas & Electric Co. (SDG&E) to work on a proposed nuclear plant known as Sundesert. The Sundesert project was abandoned on May 3, 1978 by resolution of SDG&E's board of directors, and Thornber-

8. Berm containment is a method of "placing [a nuclear] reactor in a scooped out hole and backfilling with dirt . . . to increase the margin of safety in the event of an accident which breaches the containment building." California Assembly Committee on Resources, Land Use, and Energy, *Reassessment of Nuclear Energy in California: A Policy Analysis of Proposition 15 and Its Alternatives* 155 (1976).

9. Section 25524.2 provides in relevant part:

No nuclear fission thermal powerplant, including any to which the provisions of this chapter do not otherwise apply, but excepting those exempted herein, shall be permitted land use in the state, or where applicable, be certified by the commission until both conditions (a) and (b) have been met:

(a) The commission finds that there has been developed and that the United States through its authorized agency has approved and there exists a demonstrated technology or means for the disposal of high-level nuclear waste.

(b) The commission has reported its findings and the reasons therefor pursuant to paragraph (a) to the Legislature. . . .

. . . .

(c) As used in this section, "technology or means for the disposal of high-level nuclear waste" means a method for the permanent and terminal disposition of high-level nuclear waste. It shall not necessarily require that facilities for the application of such technology and/or means be available at the time the commission makes its findings. Such disposition shall not necessarily preclude the possibility of an approved process for retrieval of such waste.

(d) The commission shall continue to receive and process notices of intention and applications for certification pursuant to this division but shall not issue a decision pursuant to Section 25523 granting a certificate until the requirements of this section have been met. All other permits, licenses, approvals or authorizations for the entry or use of the land, including orders of court, which may be required may be processed and granted by the governmental entity concerned but construction work to install permanent equipment or structures shall not commence until the requirements of this section have been met.

(e) Any nuclear fission powerplant is exempted from the provisions of this section if prior to the date on which this section is chaptered an electric utility has performed substantial construction on such powerplant and has incurred substantial expense for construction and for necessary materials for such powerplant, including, but not limited to, the following sites and facilities . . . .

10. The plaintiffs were Robert Thornberry, an individual; the Pacific Legal Foundation and the San Diego Coalition, nonprofit corporations; the San Diego Section of the American Nuclear Society; and the San Diego County Building and Construction Trades Council.

11. These plaintiffs cross-appealed from the court's denial of their summary judgment motions. We dismissed the cross-appeal on the ground that it was not taken from a final judgment. *Pacific Legal Foundation v. State Energy Resources Conserv. & Dev. Comm'n*, No. 79–3424 (9th Cir. Nov. 1, 1979) (unpublished order).

ry lost his job. According to the SDG&E board resolution, the Sundesert project was abandoned both because SDG&E had failed to obtain an exemption from the Nuclear Laws, and because the California Public Utilities Commission had denied SDG&E's application for a rate increase.

Ruling on Thornberry's motion for summary judgment, the court below held that there was sufficient causal connection between the Nuclear Laws and Thornberry's losing his job to provide Thornberry with standing. The court found Thornberry's challenge to sections 25524.1 and 25524.3 to be moot, but declared section 25524.2 to be preempted by the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2282 (1976 & Supp. III 1979). The court certified its judgment pursuant to Fed.R.Civ.P. 54(b), and the Energy Commission brought this interlocutory appeal.

## C. The PG&E Case

The second of these cases, *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission (PG&E)*, presents a much broader challenge to California's regulatory scheme. The plaintiffs, Pacific Gas & Electric Co. (PG&E) and Southern California Edison Co. (SCE), both claimed that uncertainties caused by the Nuclear Laws and the Warren-Alquist Act had caused them to cancel plans to build nuclear plants. PG&E had cancelled a specific project known as Stanislaus, while SCE had abandoned general plans to build two nuclear plants at some future time.

As in the *PLF* case, PG&E and SCE (the utilities) moved for summary judgment. The court below found that summary judgment could not be granted on the issue of standing, since disputed factual issues remained to be resolved. Accordingly, the court held a trial to determine whether the utilities had standing. The court rejected the Energy Commission's argument that economic considerations had kept the utilities from building their proposed nuclear

plants, and held that the utilities would have proceeded with their plans but for the Nuclear Laws and other provisions of the Warren-Alquist Act. The court thus concluded that the utilities had standing to sue.

Pursuant to Fed.R.Civ.P. 56(d), the court then granted summary judgment for the utilities on the merits of their claim. The court invalidated the Nuclear Laws in their entirety, invalidated the three-site requirement and the provisions regarding the acquisition of development rights, Cal.Pub. Res.Code §§ 25503, 25504, 25516, 25528, insofar as they applied to nuclear plants, and invalidated numerous other provisions of the Warren-Alquist Act[12] insofar as they touched upon matters which the court viewed as being within the authority of the Nuclear Regulatory Commission (NRC). As in *PLF*, the court held the challenged provisions to be preempted by the Atomic Energy Act.

## II

### STANDING

Before reaching the merits of these cases, we must decide whether any of the plaintiffs have standing to bring suit.

 Standing is a constitutional doctrine, derived from article III's requirement that federal courts decide only actual cases or controversies. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1923–24, 48 L.Ed.2d 450 (1976). It limits our jurisdiction to cases in which the plaintiff alleges that he has suffered a particularized injury, although admittedly the injury may be slight. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14, 93 S.Ct. 2405, 2417 n.14, 37 L.Ed.2d 254 (1973). In addition, the standing doctrine requires that the plaintiff demonstrate both "a 'fairly traceable' causal connection between the claimed injury and the challenged conduct," *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 98 S.Ct.

12. The invalidated provisions were Cal.Pub. Res.Code §§ 25500, 25502, 25504, 25511, 25512, 25514, 25516, 25517, 25519, 25520, 25523, 25532.

2620, 2630, 57 L.Ed.2d 595 (1978) (citations omitted), and "a 'substantial likelihood' that the relief requested will redress the injury claimed," *id.* at 75 n.20, 98 S.Ct. at 2631 n.20. *See Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979); *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977).

It is undisputed that the appellees in both of the cases before us have alleged particularized injuries to themselves. Our concern thus is with causation and the court's capacity to redress the injuries alleged.

### A. Thornberry

In the *PLF* case, the court below granted summary judgment for Thornberry on the standing issue. Thornberry's claim of standing rests on two premises: that the moratorium imposed by Cal.Pub.Res.Code § 25524.2 caused SDG&E to cancel the Sundesert project, and that cancellation of the Sundesert project caused Thornberry to lose his job. The Energy Commission disputes both of these premises, and further contends that Thornberry has not demonstrated either that the Sundesert project would be reinstituted or that he would be rehired if section 25524.2 were invalidated.

We may affirm a grant of summary judgment only if the material facts are undisputed and the moving party is entitled to judgment as a matter of law. Fed.R.

Civ.P. 56(c). We must view all evidence and factual inferences in the light most favorable to the non-moving party, the Energy Commission. *Heininger v. City of Phoenix*, 625 F.2d 842, 843 (9th Cir. 1980).

### 1. Cancellation of Sundesert

The Energy Commission contends that economic considerations caused SDG&E to cancel Sundesert, and that these economic considerations would keep Sundesert from being built even if section 25524.2 were invalidated. In support of this contention, the Energy Commission points to the SDG&E board of directors' resolution terminating Sundesert. Among the reasons for the termination, the resolution lists a California Public Utilities Commission (CPUC) decision issued the previous day which stated "that continued expenditures on Sundesert would, with certain exceptions, be entirely at the risk of [SDG&E's] shareholders."[13]

This CPUC decision, *Investigation on the Commission's Own Motion (San Diego Gas & Electric Company)*, No. 88758, Interim Op., OII No. 4 (CPUC May 2, 1978), and a prior resolution adopted by the CPUC, Resolution No. L–190 (CPUC July 6, 1977), made clear that the CPUC would not grant SDG&E certain types of rate relief to assist it in financing the Sundesert project.[14] The Energy Commission submitted affidavits from a number of experts in the area of energy regulation and financing indicating

---

**13.** The SDG&E board resolution, dated May 3, 1978, read in relevant part:

WHEREAS, at its meeting on January 27, 1978, this Board resolved not to terminate the Sundesert Project before May 1, 1978 in order to give the legislature and governor time to exempt Sundesert from Sections 25524.1 and 25524.2 of the California Public Resources Code; and

WHEREAS, the officers and this Board have continuously monitored events occurring since January 27, 1978; and

WHEREAS, Sundesert cannot be timely certified by the California Energy Resources Conservation and Development Commission without such an exemption, which, while diligently sought by the Company, has not yet been obtained and does not appear to be readily obtainable; and

WHEREAS, in Decision No. 88758, dated May 2, 1978, the California Public Utilities

Commission advised the Company that continued expenditures on Sundesert would, with certain exceptions, be entirely at the risk of the Company's shareholders.

RESOLVED, that the officers of the Company are directed to take all appropriate steps to:

1. Immediately stop any further Sundesert expenditures, other than those associated with the actions described below and those required by law.

. . . .

**14.** SDG&E intended to finance Sundesert by issuing new securities. Due to restrictions contained in existing bonds, however, new securities could be issued only if SDG&E's earnings could be maintained at a certain level. To maintain such earnings, SDG&E requested two types of rate relief: (1) an increase in its authorized rate of return on equity, and (2) the inclu-

that Sundesert could not be financed without the requested rate relief.[15] This evidence raised a material question of fact. A trier of fact could have concluded that economic considerations caused the cancellation of Sundesert, and that the elimination of section 25524.2 would not have altered SDG&E's decision. Summary judgment on the issue of standing was therefore improper.

In addition, the Energy Commission's evidence showed that SDG&E had asked the California legislature to exempt Sundesert from the requirements of section 25524.2, pursuant to the provisions of Cal.Pub.Res. Code § 25524.25. A bill granting such an exemption had passed the California Senate and was pending in the Assembly at the time SDG&E decided to abandon its Sundesert project.[16] A trier of fact could have inferred that if section 25524.2 were the primary obstacle facing the Sundesert project, SDG&E would have waited for more definitive adverse action by the California legislature before cancelling the project.

Thornberry contends that section 25524.2 provided an "independent reason" for the

---

15. Affidavits were submitted by, *inter alia*, Richard L. Maullin, chairman of the Energy Commission and its presiding officer during consideration of the Sundesert notice of intention; Robert Logan, the Energy Commission economist in charge of studying utilities' financing capabilities; and Raymond J. Czahar, the CPUC financial examiner assigned to review SDG&E's proposal for financing Sundesert. The affidavits described SDG&E's financial position and stated that in the affiants' professional opinions, Sundesert could not be financed without a fundamental change in ratemaking policy. The affidavits also stated that in the affiants' opinions such a policy change was unlikely.

The court below disregarded these affidavits on the ground that they "state[d] only . . . declarants' opinions." *Pacific Legal Foundation v. State Energy Resources Conserv. & Dev. Comm'n*, 472 F.Supp. 191, 195 (S.D.Cal.1979). Expert opinion testimony is admissible at trial, however, Fed.R.Evid. 702, 703, 704, and affidavits containing such testimony must be considered in ruling on a summary judgment motion. *See Bieghler v. Kleppe*, 633 F.2d 531, 533–34 (9th Cir. 1980).

The affidavits described SDG&E's finan-

sion of the costs of "construction work in progress" (CWIP) in its rate base.

Affidavits submitted by the Energy Commission show that the CPUC has never granted any utility a rate of return on equity higher than 13.49% and has never allowed the inclusion of CWIP in a utility's rate base. SDG&E has itself estimated that it would need a 14.5% rate of return together with the inclusion of CWIP in order to finance Sundesert. Others estimated that the necessary rate without the inclusion of CWIP might be as high as 21%. In response to an SDG&E request for rate relief, the CPUC stated that the inclusion of CWIP was "completely foreign to [California's] historical ratemaking policy" and would be opposed by the CPUC "in the absence of exhaustive analyses of alternatives . . . [and] a showing of extraordinary need." Resolution No. L-190 (CPUC July 6, 1977).

The CPUC reaffirmed this policy in its opinion of May 2, 1978, finding that Sundesert was "infeasible under the Commission's adopted ratemaking practices." *Investigation on the Commission's Own Motion (San Diego Gas & Electric Company)*, No. 88758, Interim Op., OII No. 4 at 45 (CPUC May 2, 1978). The CPUC thus advised SDG&E "that continued expenditures on the Sundesert nuclear facility . . . can only be recaptured by the company [through inclusion in its rate base] if the Sundesert nuclear facility is ultimately operational." *Id.* at 48. The CPUC recommended that alternate means of producing energy be considered.

16. Cal.Pub.Res.Code § 25524.25 directed the Energy Commission to notify the California legislature, no later than January 16, 1978, whether the findings required by sections 25524.1 and 25524.2 could be made at that time. The Energy Commission was then to recommend whether to exempt any nuclear plants for which notices of intention had been submitted prior to January 1, 1977. The Energy Commission recommended against exempting Sundesert. A Sundesert exemption bill, S.B. 1015, was nevertheless passed by the California Senate on January 26, 1978. The following day, the SDG&E board of directors resolved "to exert every reasonable effort to obtain an unconditional statutory exemption of Sundesert from the nuclear statutes" and "not [to] terminate the Sundesert Project before May 1, 1978, thereby providing time for the legislature and the governor to statutorily exempt Sundesert from the nuclear statutes."

On April 13, 1978, the California Assembly Committee on Resources, Land Use, and Energy voted against S.B. 1015. The record does not show whether this committee vote effectively killed the bill, or whether further proceedings were expected. The SDG&E board voted to terminate the Sundesert project on May 3, 1978.

cancellation of Sundesert, because section 25524.2 would have forced SDG&E to cancel the project irrespective of any financial impediments. Even if this were true, it would not suffice to give Thornberry standing. The standing doctrine requires Thornberry to show "a 'substantial likelihood' that the relief requested will redress the injury claimed," *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 75 n.20, 98 S.Ct. 2620, 2631 n.20, 57 L.Ed.2d 595 (1977); *Legal Aid Society of Alameda County v. Brennan*, 608 F.2d 1319, 1333 (9th Cir. 1979).[17] Such a showing has not been made here. If the Sundesert project is not financially feasible, as the evidence submitted by the Energy Commission suggests, invalidation of section 25524.2 would not cause SDG&E to reinstate its Sundesert plans. On the record now before us, it is purely speculative whether the remedy Thornberry seeks would lead to the redress of his injury. Such "unadorned speculation will not suffice to invoke the federal judicial power." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976).

### 2. Loss of Thornberry's job

Even if Thornberry could show that the invalidation of section 25524.2 would lead to the Sundesert project being revived, he would not necessarily have standing to bring this suit. He would also have to show that abandonment of the Sundesert project caused him to lose his job, and that revival of the project might result in his being rehired. We agree with the Energy Commission that Thornberry has not made a showing sufficient to support the trial court's grant of summary judgment in his favor. Although Thornberry's affidavit states that the cancellation of Sundesert caused him to lose his job,[18] he has not even alleged, much less proved, that he might get his job back if the Sundesert project were revived. Only SDG&E could restore Thornberry to his job, and SDG&E is not a party to this action. Because "the solution to [Thornberry's] problem depends on decisions and actions by third parties who are not before the court and who could not properly be the subject of a decree directing the result sought," *Bowker v. Morton*, 541 F.2d 1347, 1350 (9th Cir. 1976), Thornberry has not shown standing to sue.

We do not hold that a plaintiff who suffers an indirect injury of this sort will never have standing to challenge government action that has arguably caused the injury. If SDG&E officials had promised Thornber-

---

17. Thornberry argues that causation and redress are simply alternate ways of expressing the same idea. In Thornberry's view, no separate showing of redressability is necessary if it can be shown that the challenged statute caused his injury. We disagree. At least in cases such as Thornberry's, where the claimed injury results from the independent action of a third party not before the court, *see Davis v. United States Dep't of Hous. & Urban Dev.*, 627 F.2d 942, 944–45 (9th Cir. 1980), both this court and the Supreme Court have consistently required plaintiffs to show that their injuries would be redressable by the court's action. *E.g., Duke Power Co. v. Carolina Envir. Study Group, Inc.*, 438 U.S. 59, 75–77, 98 S.Ct. 2620, 2631–32, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 40–44, 96 S.Ct. 1917, 1925–27, 48 L.Ed.2d 450 (1976); *Boating Indus. Ass'ns v. Marshall*, 601 F.2d 1376, 1380 (9th Cir. 1979); *Bowker v. Morton*, 541 F.2d 1347, 1349–50 (9th Cir. 1976).

18. We are somewhat doubtful that Thornberry's unsupported and conclusory affidavit would be sufficient to establish, for purposes of his motion for summary judgment, that he lost his job because Sundesert was cancelled. Under Fed.R.Civ.P. 56(e), affidavits in support of a motion for summary judgment must be made on personal knowledge, and must affirmatively show that the affiant is competent to testify to the matters set forth. *See Rossi v. Trans World Air Lines, Inc.*, 507 F.2d 404, 406 (9th Cir. 1974). Thornberry's affidavit states only that his "employment was terminated as a result of the suspension of the Sundesert project," and it is not clear from the record that this statement is based on Thornberry's personal knowledge, as rule 56(e) requires. The record is devoid of affidavits or other evidence from Thornberry's superiors at SDG&E who might have personal knowledge of the reasons for his termination.

ry his job back were the Sundesert project revived, a trier of fact might conclude that Thornberry had shown a substantial likelihood of redress. *See, e. g., Duke Power,* 438 U.S. at 76–77, 98 S.Ct. at 2632 (plans of power plant officials sufficient to give surrounding citizens standing); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977) (plans of specific developer sufficient to give prospective resident standing). On the record before us, however, it is a mere speculative possibility that the relief sought would remedy Thornberry's injury.

*B. The Utilities*

The *PG&E* case comes to us in a different procedural posture and on quite different facts. The plaintiffs, PG&E and SCE, allege direct injuries. They claim that the Warren-Alquist Act and the Nuclear Laws impose burdens on them which have caused them to cancel plans to build nuclear plants. Since the redress of these injuries would not depend upon the actions of third parties not before the court, our inquiry can be limited to a single question: whether the plaintiffs' injuries are "fairly traceable" to the Warren-Alquist Act and the Nuclear Laws. *Arlington Heights,* 429 U.S. at 261–62, 97 S.Ct. at 561–62. If the statutes directly caused the claimed injuries, we can assume for standing purposes that the injuries would be redressed by invalidation of the statutes. *See Davis v. United States Department of Housing & Urban Development,* 627 F.2d 942, 944–45 (9th Cir. 1980).

The court below limited its grant of summary judgment for the utilities to the issue of preemption. On the issue of whether the utilities had standing, the court held a trial pursuant to Fed.R.Civ.P. 56(d). Although standing is usually determined on the pleadings, a trial may be held if the facts alleged to support standing are in dispute. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 115 n.31, 99 S.Ct. 1601, 1616 n.31, 60 L.Ed.2d 66 n.31 (1979). A reviewing court is then bound by the trial court's findings of fact unless they are clearly erroneous. *Duke Power,* 438 U.S. at 74 n.19, 98 S.Ct. at 2631 n.19.

The trial court found that both PG&E and SCE had decided to include nuclear plants among their power generating facilities in the 1990's; that PG&E had planned to build a nuclear plant known as Stanislaus, for which it had filed a notice of intention with the Energy Commission; that SCE had planned to participate in the building of two nuclear plants known as Nuclear 1 and Nuclear 2; and that both PG&E and SCE had cancelled their plans in the belief that, as a practical matter, the challenged statutory provisions made it impossible for them to proceed. The court further found that PG&E and SCE would reinstate their plans to build nuclear plants if the challenged statutes were invalidated.

The Energy Commission contends here, as it did in the trial court, that the utilities' proposed nuclear plants would not be built even if the challenged statutes were invalidated. The Energy Commission has presented evidence showing that many planned nuclear plants have been cancelled in recent years due to federal regulatory restraints, safety concerns growing out of the Three Mile Island incident, difficulties in obtaining financing, and reduction in demand for electricity. The trial court specifically found that the utilities had considered these factors, and had nevertheless decided to proceed with their nuclear plans if the challenged provisions of the Warren-Alquist Act were struck down.

We cannot say that the findings of the court below are clearly erroneous. It is true, as the Energy Commission asserts, that many factors beyond the utilities' control might eventually keep the proposed plants from being built. But the utilities do not lack standing merely because they would still have to secure financing, meet the requirements of the Nuclear Regulatory Commission, and comply with other regulations. As the Supreme Court has pointed out, all construction projects "are subject to some extent to similar uncertainties." *Arlington Heights,* 429 U.S. at 261, 97 S.Ct. at

561. Because the challenged statutes stand as an absolute barrier to construction of the proposed plants, and because that barrier will be removed if the utilities secure the injunctive relief they seek, it is irrelevant that an injunction would not guarantee that the plants will be built. *Id.* It is sufficient that the utilities intend to proceed if the statutes are invalidated. The utilities therefore have standing to sue.

### III

### RIPENESS

We next consider whether any of the challenges to the statutory provisions before us are ripe for review.

■ The doctrines of standing and ripeness are closely related, in that the application of either is intended to "prevent courts from becoming enmeshed in abstract questions which have not concretely affected the parties." *Pence v. Andrus*, 586 F.2d 733, 737 (9th Cir. 1978). Like standing, the ripeness doctrine is based in part upon the article III requirement that courts decide only cases or controversies. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974). The exercise of judicial restraint, however, is an added ingredient of the ripeness doctrine by which courts can decline to decide issues which are not yet fit for adjudication. *Id.* Thus, while both doctrines require us to ask whether the plaintiff has suffered harm, ripeness requires an additional inquiry into "whether the harm asserted has matured sufficiently to warrant judicial intervention." *Warth v. Seldin*, 422 U.S. 490, 499 n.10, 95 S.Ct. 2197, 2205 n.10, 45 L.Ed.2d 343 (1975).

■ In deciding whether an issue is ripe for review, we "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v.*

*Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); *see Western Oil & Gas Association v. United States Environmental Protection Agency*, 633 F.2d 803, 807 (9th Cir. 1980); *Pence*, 586 F.2d at 737.[19] A challenge to a statute or regulation that has not yet been applied is generally considered fit for judicial determination if the issue raised is a "purely legal one," *Abbott Laboratories*, 387 U.S. at 149, 87 S.Ct. at 1515, or one which "further factual development will not render more concrete." *Western Oil & Gas*, 633 F.2d at 808; *see Gardner v. Toilet Goods Association*, 387 U.S. 167, 171, 87 S.Ct. 1526, 1528, 18 L.Ed.2d 704 (1967). On the other hand, if the issue would be illuminated by the development of a better factual record, the challenged statute or regulation is generally not considered fit for adjudication until it has actually been applied. *Regional Rail Reorganization Act Cases*, 419 U.S. at 143–44, 95 S.Ct. at 358–59; *Pence*, 586 F.2d at 737 & n.12.

With these principles in mind, we address first, the general certification scheme for electric power plants; second, the requirement that utilities acquire development rights surrounding their proposed plants; third, the requirement that utilities propose three alternate sites for their plants; and finally, the restrictions imposed by the Nuclear Laws.

### A. The Warren-Alquist Act

#### 1. The certification system

■ The certification requirement is the centerpiece of the Warren-Alquist Act's regulatory scheme. In order to decide whether to certify a proposed plant, the Energy Commission gathers information from many sources including the applicant, on a wide variety of issues. The utilities challenge the Energy Commission's power to gather such information, as well as its power to deny certification.

---

**19.** Although the *Abbott Laboratories* standard was developed in the context of judicial review of agency actions, it is equally applicable to the present context, where a statute is challenged as unconstitutional. *See Babbitt v. United*

*Farm Workers Nat'l Union*, 442 U.S. 289, 300–01 & n.12, 99 S.Ct. 2301, 2310 n.12, 60 L.Ed.2d 895 (1979); *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 143–47, 95 S.Ct. 335, 358–59, 42 L.Ed.2d 320 (1974).

We find that the challenges to the provisions establishing this regulatory scheme, Cal.Pub.Res. Code §§ 25500, 25502, 25504, 25511, 25512, 25514, 25516, 25517, 25519, 25520, 25523, 25532, are not ripe for adjudication. On the record before us, we have no way of knowing what types of information the Energy Commission might require of the utilities, or to what purposes the information might be put. As we explain *infra* at pp. 920–923, the utilities' preemption claim may depend upon the reasons for which the Energy Commission requests information or, ultimately, its reasons for denying certification. We cannot presently tell whether the Energy Commission will ever deny certification, or whether such a denial might be based upon impermissible reasons. Because the issue presented "requires factual development, and should not be decided in the abstract," *Pence v. Andrus*, 586 F.2d 733, 737 (9th Cir. 1978), we hold that the challenges to these sections are not ripe.

We also note that a delay in adjudication will not cause any undue hardship for the parties. The certification scheme, in general, does not have an "immediate and substantial impact" on the utilities, *Gardner v. Toilet Goods Association*, 387 U.S. 167, 171, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); neither PG&E nor SCE has a notice of intention or application for certification pending,[20] and the threat that procedural burdens might someday be imposed or that certification might someday be denied for failure to meet Energy Commission standards is remote at best.

The utilities contend that the certification system precludes planning for new nuclear plants, and thus does have an immediate impact. In the utilities' view, their planning abilities are compromised by "the risks that the Energy Commission will deny certification and/or the plaintiffs will be caught in a maze of conflicting decisions and requirements imposed by the Commission and the NRC." Such risks are, however, present whenever a plaintiff challenges a statute that has not yet been applied. *E. g., Boating Industry Associations v. Marshall*, 601 F.2d 1376, 1384–85 (9th Cir. 1979). The utilities cannot establish a justiciable controversy by simply asserting that the risk of future harm causes them a present injury. As we said in *Sea Ranch Association v. California Coastal Zone Conservation Commissions*, 537 F.2d 1058 (9th Cir. 1976), "[a] case or controversy is not presented simply because a party is subject to a general regulatory process which, when applied to the specific facts developed in some future administrative proceeding, *might* cause a state agency to take a particular action which some court *might* thereafter determine to be unconstitutional." *Id.* at 1063 (emphasis in original). *See Toilet Goods Association v. Gardner*, 387 U.S. 158, 163, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).

### 2. The acquisition of development rights

A similar analysis convinces us that the challenge to section 25528 is not ripe for review. In one sense, it presents a purely legal question: can California require a utility to acquire development rights so as to limit the population density surrounding its nuclear plants, when the NRC has not done so? Several factors persuade us, however, that the question would be better decided after the statute has been applied.

First, the Energy Commission may not need to exercise its power to require acquisition of development rights. The Energy Commission is directed to waive the requirement to the extent that existing land use laws maintain a safe population level. Cal.Pub.Res. Code § 25528(c). We have no way of knowing at present whether the Energy Commission will find such laws to

---

**20.** Prior to the commencement of this lawsuit, PG&E had attempted to submit a notice of intention for its Stanislaus project. The Energy Commission rejected the notice because it contained insufficient data, but a California court ordered the notice accepted. *Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n*, No. 732–870 (Cal.Super.Ct., memorandum of intended decision May 22, 1978; stipulated judgment entered. Aug. 15, 1978). PG&E did not resubmit the notice of intention.

be insufficient in any particular case. We are reluctant to rule on the constitutionality of a statute that may never be used. *See Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 305, 99 S.Ct. 2301, 2312, 60 L.Ed.2d 895 (1979). Moreover, the statute contemplates that the Energy Commission will ordinarily follow NRC standards on population density. Cal.Pub.Res. Code § 25528(b).[21] It is not clear whether the statute authorizes the Energy Commission to set standards different from those of the NRC. To date, the Energy Commission has neither interpreted the statute nor set different standards. If it did so, our preemption analysis might be affected.

For these reasons, and because we see no harm to the parties in delay, we hold that the utilities' challenge is not ripe. The issue must await the Energy Commission's enforcement of section 25528 in the face of an actual application for certification.

### 3. The three-site requirement

We find that section 25503, requiring a utility to include at least three alternate sites in its notice of intention, is ripe for review.[22] Unlike the other challenged provisions, the validity of this section is unlikely to depend upon the factual setting in which it is applied. The section applies unequivocally to any utility wishing to submit a notice of intention. Its operation is in no way hypothetical or speculative. *See Regional Rail Reorganization Act Cases,* 419 U.S. 102, 143, 95 S.Ct. 335, 358, 42 L.Ed.2d 320 (1974). We therefore see no reason to delay adjudication until a utility

actually submits a notice of intention containing less than three sites. "Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." *Id.; see Nyquist v. Mauclet,* 432 U.S. 1, 6 n.7, 97 S.Ct. 2120, 2124 n.7, 53 L.Ed.2d 63 (1977).

### B. The Nuclear Laws

### 1. Sections 25524.1 and 25524.3

The challenges to these sections do not present justiciable controversies. Section 25524.1(a) bars only nuclear plants which require fuel rod reprocessing, and no such plants are currently being planned.[23] The Energy Commission has specifically concluded that fuel rod reprocessing is not currently required, either by the federal government or by existing technology. *In the Matter of Implementation of Nuclear Reprocessing and Waste Disposal Statutes,* Nos. 76–NL–1, 76–NL–3 at 2–3 (ERCDC Jan. 25, 1978). Section 25524.1(a) therefore has no present effect and poses no concrete threat to the utilities.

Section 25524.1(b) requires the Energy Commission to determine the adequacy of nuclear plants' spent fuel storage capacity. The Energy Commission intends to make such a determination on a case-by-case basis, as the statute requires. *In the Matter of Implementation of Nuclear Reprocessing and Waste Disposal Statutes,* Nos. 76–NL–

---

**21.** Section 25528(b) provides that:

 In the case of an application for a nuclear facility, the area and population density necessary to insure the public's health and safety designated by the commission shall be that as determined from time to time by the United States Nuclear Regulatory Commission, if the commission finds that such determination is sufficiently definitive for valid land use planning requirements.

**22.** Our conclusion as to the validity of section 25503 will necessarily affect the validity of two other sections as well: section 25504, requiring certain information as to each of the sites, and section 25516, requiring that at least two sites be found acceptable unless the Energy Com-

mission finds that only one acceptable site is available.

**23.** Reprocessing is a mechanical and chemical means of processing spent fuel so as to recover reusable uranium and plutonium. At the time section 25524.3 was enacted into law, reprocessing was viewed as the only available method of disposing of spent fuel. At present, however, concerns about nuclear proliferation and the expense of reprocessing have resulted in spent fuels being stored rather than reprocessed. *See* Nuclear Fuel Cycle Committee, *Status of Nuclear Fuel Reprocessing, Spent Fuel Storage and High-Level Waste Disposal* 8–9 (ERCDC Draft Report Jan. 11, 1978).

1, 76–NL–3 at 5 (ERCDC Jan. 25, 1978). Although an Energy Commission committee report at one point recommended requiring all nuclear plants to provide a specified amount of storage space, see Nuclear Fuel Cycle Committee, *Status of Nuclear Fuel Reprocessing, Spent Fuel Storage and High-Level Waste Disposal* 113 (ERCDC Draft Report Jan. 11, 1978), the Energy Commission has not adopted such a requirement. Because we cannot know whether the Energy Commission will ever find a nuclear plant's storage capacity to be inadequate, we hold that the challenge to section 25524.1(b) is not ripe for review.

Section 25524.3 imposed a moratorium on certification of nuclear plants pending submission of a certain report to the California legislature. Such a report was adopted by the Energy Commission on September 13, 1978. *In the Matter of the Determinations of the Commission Pursuant to Public Resources Code Section 25524.3*, No. 76–NL–2 (ERCDC Sept. 13, 1978). The record provides no support for the lower court's finding that this report was not submitted to the legislature, and a member of the Energy Commission has testified that it was so submitted. We conclude that the challenge to section 25524.3 is moot.

### 2. Section 25524.2

▉ Although sections 25524.1(a) and 25524.3 pose no present barrier to the development of nuclear power in California, we cannot say the same of section 25524.2. This section imposes a moratorium on the certification of new nuclear plants until the Energy Commission has found, and has informed the legislature, that a federally approved method of nuclear waste disposal exists. The Energy Commission has not made the required findings. Section 25524.2 therefore remains in effect, and bars the certification of any new nuclear plants in California.

Section 25524.2 does not have any immediate impact on the utilities; they may continue to submit notices of intention and applications for certification for their proposed nuclear plants, and the Energy Commission must still receive and process the notices and applications even though the required findings have not been made. Cal. Pub.Res.Code § 25524.2(d). No plants may be certified until the findings are made, but the utilities concede that their proposed plants are many years from being eligible for certification.

Nevertheless, we conclude that the challenge to section 25524.2 is ripe for adjudication. The issue before us is a purely legal one, and our ability to deal with it would not be enhanced if we were to delay review. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 81–82, 98 S.Ct. 2620, 2634–35, 57 L.Ed.2d 595 (1978). Postponement could, moreover, work substantial hardship on the utilities. On the one hand, they could proceed with their plans in the hopes that, when the time for certification came, either the required findings would be made or the law would be struck down. This would require massive expenditures over a number of years, expenditures that quite possibly could not be recovered unless the plant were eventually certified. Alternatively, the utilities could abandon their plans to use nuclear power, with the result that no challenge to section 25524.2 would ever be ripe.

We see no need to place the utilities in such a quandary. Since consideration of the underlying legal issues would be no easier in the context of a specific certification proceeding, we hold that the issues are ripe. We accordingly turn to the merits of the utilities' preemption claim as it relates to sections 25503 and 25524.2.[24]

---

**24.** The court below did not abuse its discretion in declining to abstain. Abstention under the doctrine of *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), is inappropriate because the case before us does not involve a doubtful issue of state law. *See Canton v. Spokane School Dist. No. 81*, 498 F.2d 840, 845 (9th Cir. 1974). Section 25524.2 unambiguously provides that no nuclear plants are to be certified until certain findings have been made, and it is undisputed that the findings have not been made. Abstention under the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), is also

## IV

## PREEMPTION

■ When a state statute is challenged under the supremacy clause, U.S.Const. art. VI, cl. 2, our inquiry is directed to whether Congress intended to prohibit the states from regulating in such a manner. We start with the assumption that the states' police powers were not to be superseded "unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947); *accord, e. g., Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977).

■ Congress's purpose is most clear, of course, when the federal statute at issue explicitly prohibits state regulation in the same field. *E. g., Rath Packing*, 430 U.S. at 530–31, 97 S.Ct. at 1312. When the federal statute contains no such prohibition, congressional intent to preempt may be inferred from the nature of the federal regulatory scheme, *e. g., Ray*, 435 U.S. at 163, 98 S.Ct. at 997; *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973), or from the subject matter being regulated, *e. g., Rice*, 331 U.S. at 230, 67 S.Ct. at 1152; *Hines v. Davidowitz*, 312 U.S. 52, 62–63, 61 S.Ct. 399, 401–02, 85 L.Ed. 581 (1941). Congressional intent to preempt must, however, be unambiguous. *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146–47, 83 S.Ct. 1210, 1219–20, 10 L.Ed.2d 248 (1963). An intent to preempt cannot be inferred from the mere fact that the federal statute is detailed and complex, *see De Canas v. Bica*, 424 U.S. 351, 359–60, 96 S.Ct. 933, 938, 47 L.Ed.2d 43 (1976); *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973), or because the state legislation touches an area of predominant-

ly national concern, *e. g., De Canas*, 424 U.S. at 354–55, 96 S.Ct. at 935–36; *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974).

■ Even if Congress did not intend to preempt all state legislation in a given field, a state law must be held invalid to the extent that it actually conflicts with federal law. For example, a conflict will be found "where compliance with both federal and state regulations is a physical impossibility," *Florida Lime*, 373 U.S. at 142–43, 83 S.Ct. at 1217–18, or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. *Accord, Ray*, 435 U.S. at 158, 98 S.Ct. at 994; *Rath Packing*, 430 U.S. at 525–26, 97 S.Ct. at 1309–10. Once again, however, the presumption operates in favor of the validity of the state law; courts are not to seek out conflicts between state and federal regulation where none clearly exist. *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 446, 80 S.Ct. 813, 817–18, 4 L.Ed.2d 852 (1960); *see Rice*, 331 U.S. at 237, 67 S.Ct. at 1155–56.

### A. Congressional Intent to Preempt

#### 1. Division of federal and state authority in the Atomic Energy Act

■ To determine whether Congress intended to preempt states from regulating nuclear power in the ways California has chosen, we start with an examination of the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2282 (1976 & Supp. III 1979). The history of the Atomic Energy Act of 1954 has been reviewed extensively elsewhere, *see, e. g., Northern States Power Co. v. Minnesota*, 447 F.2d 1143, 1147–52 (8th Cir. 1971), *aff'd mem.*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972); Murphy & La Pierre, *Nuclear "Moratorium" Legislation in the States and the Supremacy Clause: A Case of Express Preemption*, 76 Colum.L.

inappropriate. California has not concentrated challenges to the Warren-Alquist Act in any specialized state court, and the federal issues involved in this case are easily separable from

any state issues. *See IBEW Local No. 1245 v. Public Serv. Comm'n*, 614 F.2d 206, 211 (9th Cir. 1980).

Rev. 392, 394–410 (1976), and need only be summarized briefly here.

This country's exploration of the peaceful uses of nuclear power began shortly after World War II, with passage of the Atomic Energy Act of 1946, ch. 274, 60 Stat. 755. The 1946 Act transferred responsibility for the development of nuclear power from the military establishment to the civilian Atomic Energy Commission (AEC),[25] but left the federal government with complete control over all nuclear materials and facilities. This federal monopoly ended with passage of the Atomic Energy Act of 1954, which allowed private industry to participate for the first time in the development of nuclear power. The 1954 Act authorized private industry to conduct research and build commercial reactors, under licenses from the AEC. There were no immediate commercial applications of nuclear power at the time the 1954 Act was passed, but Congress believed that nuclear power at a competitive price was at least "on the horizon." S.Rep.No.1699, 83d Cong., 2d Sess., reprinted in [1954] U.S.Code Cong. & Ad.News 3456, 3458.

Two sections of the Atomic Energy Act of 1954 are significant in determining how Congress intended to divide regulatory responsibility between the states and the federal government. Section 271, 42 U.S.C. § 2018 (1976), provides that nothing in the Atomic Energy Act "shall be construed to affect the authority or regulations of any Federal, State, or local agency with respect to the generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the [Nuclear Regulatory] Commission." This section was included in the 1954 Act to ensure that electricity produced by nuclear plants would be subject to the same regulatory authority as electricity produced by any other means. See 100 Cong.Rec. 12015, 12197, 12198, 12199 (1954) (remarks of Sen. Hickenlooper & Sen. Humphrey); H.R.Rep.No.567, 89th Cong., 1st Sess., reprinted in [1965] U.S. Code Cong. & Ad.News 2775, 2779.[26] The states' existing authority to regulate utilities was to remain unchanged. As Senator Hickenlooper, the floor manager of the Senate bill, explained:

> We take the position that electricity is electricity. Once it is produced it should be subject to the proper regulatory body, whether it be the Federal Power Commission in the case of interstate transmission, or State regulatory bodies if such exist, or municipal regulatory bodies. We feel that there is no difference and that it should be treated as all other electricity which is regulated by the public.
>
> . . . .
>
> [Section 271] is designed to keep the regulatory authority exactly as it is now, traditionally and under the law.

100 Cong.Rec. 12015 (1954).

By 1959, Congress recognized that a more precise line needed to be drawn between the regulatory authority of the AEC and that of the states. Section 274, 42 U.S.C. § 2021 (1976), was added to the Atomic Energy Act of 1954 in an attempt to draw such a line. See S.Rep.No.870, 86th Cong., 1st Sess., reprinted in [1959] U.S.Code Cong. & Ad.News 2872, 2873–74, 2878–80. Section 274 authorized the AEC to turn over to particular states the regulatory responsibility for radioisotopes and other less hazardous nuclear materials. The AEC and its successor agency, the NRC, retained sole

---

**25.** The AEC was dismantled by section 104 of the Energy Reorganization Act of 1974, 42 U.S.C. § 5814, and its promotional functions were transferred to the Energy Research and Development Administration, id. The AEC's regulatory functions were transferred to the NRC. Id. § 5841. The effects of the Energy Reorganization Act are further discussed at pp. 926–927 infra.

**26.** Section 271 was amended in 1965 to provide that states were not authorized to regulate ac-

tivities of the AEC itself. The amendment was intended to overturn the holding of Maun v. United States, 347 F.2d 970 (9th Cir. 1965), which had required an AEC-owned research facility to comply with municipal zoning ordinances. The committee report accompanying the 1965 amendment makes clear that the states' authority over non-AEC projects was not affected. H.R.Rep.No. 567, 89th Cong., 1st Sess., reprinted in [1965] U.S.Code Cong. & Ad.News 2775.

responsibility for regulating certain more hazardous activities, including "the construction and operation of any production or utilization facility," *i. e.*, nuclear plant. § 274(c)(1), 42 U.S.C. § 2021(c)(1); *see* § 11, 42 U.S.C. § 2014(cc) (1976). Subsection (k), however, provided that "[n]othing in this section shall be construed to affect the authority of any State or local agency to regulate activities for purposes other than protection against radiation hazards." § 274(k), 42 U.S.C. § 2021(k).

The parties' dispute centers on these sections. The utilities argue that section 274(c) gives the NRC sole authority to regulate, for all purposes, the construction and operation of nuclear plants. With regard to the three-site requirement and moratorium provision now before us, the utilities assert that section 274(c) authorizes the NRC to delay licensing of any further nuclear plants until a method of waste disposal is developed, or to require utilities to submit alternate sites for their proposed plants. Since section 274(c) gives the NRC the power to regulate in this manner, the utilities argue that it necessarily takes away the states' power to regulate.

We think the preemptive effect of section 274(c) is considerably narrower, since it must be read in conjunction with sections 271 and 274(k). Section 271 preserves the states' traditional authority over electrical utilities, and thus permits the states to decide whether additional power plants are needed. The states can also require the submission of accounting data, regulate rates, and the like. Congressional intent

with respect to these powers is clear: the states are permitted to treat nuclear plants exactly as they would all other power plants. *See* 100 Cong.Rec. 12015–16, 12197– 200 (1954).

Congressional intent with respect to section 274 is nearly as clear. Both the hearings on section 274 and the report of the Joint Committee on Atomic Energy demonstrate Congress's intent to assert exclusive federal control over the radiation hazards associated with nuclear materials.[27] Limited regulatory authority may be turned over to the states pursuant to section 274(b), but section 274(c) requires the NRC to retain full regulatory control over matters concerning radiation hazards. *See, e. g., Federal-State Relationships, supra* note 27, at 488–97; Letter from A. R. Luedecke to Senator Clinton P. Anderson, *reprinted in Federal-State Relationships, supra* note 27, at 500; S.Rep.No.870, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad. News 2872, 2879. However, we find no indication in section 274 or elsewhere in the Atomic Energy Act of 1954 that Congress intended to preempt any state regulation other than that involving radiation hazards. On the contrary, section 274(k) specifically allows the states to regulate "for purposes other than protection against radiation hazards." The committee report explains that "[t]his subsection is intended to make it clear that the bill does not impair the State authority to regulate activities of the AEC licensees for the manifold health, safety, and economic purposes other than radiation

---

**27.** The Joint Committee on Atomic Energy at one point considered a more explicit version of section 274(k), which would have prohibited the states from regulating "concerning the control of radiation hazards," but would have permitted the states to "adopt registration requirements for [nuclear] materials" and "inspect the use of such materials within the State." S. 2568/H.R. 8755, 86th Cong., 1st Sess., *reprinted in Federal-State Relationships in the Atomic Energy Field: Hearings Before the Joint Committee on Atomic Energy*, 86th Cong., 1st Sess. 486, 488 (1959) [hereinafter cited as *Federal-State Relationships*]. The AEC asked that these provisions be deleted, and that section 274(k) be reduced to its present form. *See Federal-State Relationships, supra*, at 489

(statement of John A. McCone, Chairman, AEC); Letter from A. R. Luedecke, General Manager, AEC, to Senator Clinton P. Anderson, Chairman, Joint Committee on Atomic Energy, *reprinted in Federal-State Relationships, supra*, at 500. The AEC's general manager explained that control over radiation hazards was still preempted under its version of the bill, but that the revision "le[ft] room for the courts to determine the applicability of particular State laws and regulations dealing with matters on the fringe of the [bill's] preempted area." *Id. See Federal-State Relationships, supra*, at 493 (remarks of Robert Lowenstein) (revision leaves courts a little more "latitude of interpretation" and avoids the "rigidity of statutory construction").

protection." S.Rep.No.870, 86th Cong., 1st Sess., *reprinted in* [1959] U.S.Code Cong. & Ad.News 2872, 2882. Although section 274(c) gives the NRC sole authority to regulate "the construction and operation of [nuclear power plants]," the specific non-preemption language contained in sections 271 and 274(k) must control the general language of section 274(c). We therefore conclude that Congress intended to preempt only state regulation of radiation hazards associated with nuclear power,[28] and not state regulation for other purposes.[29]

We find support for our reading of the statute in the consistent position of the NRC, the AEC, and the courts, that states are permitted to regulate in such areas as economics and the environment. The AEC originally asserted that environmental considerations were the exclusive concern of the states, and could not be taken into account during AEC licensing proceedings. *New Hampshire v. Atomic Energy Commission,* 406 F.2d 170 (1st Cir.), *cert. denied,* 395 U.S. 962, 89 S.Ct. 2100, 23 L.Ed.2d 748 (1969); *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 531 & n.10, 98 S.Ct. 1197, 1205–06 & n.10, 55 L.Ed.2d 460 (1978). In *New Hampshire v. AEC,* for example, the AEC argued that it did not need to consider the possibility that a proposed nuclear plant would cause thermal pollution, because "no licensing action on its part relieved a licensee from any obligation to comply with state authorities . . . which do have jurisdiction to deal with thermal effects of power plant discharges." 406 F.2d at 173. The court upheld the AEC's position, and the AEC continued to disregard environmental considerations until the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1976), required it to take environmental issues into account. *See Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission,* 449 F.2d 1109, 1112–13 (D.C.Cir. 1971).[30]

Economic considerations have similarly been regarded as outside the purview of the AEC and the NRC. The court in *Cities of Statesville v. Atomic Energy Commission,* 441 F.2d 962, 975 (D.C.Cir.1969) (en banc), remarked that the AEC "concerns itself not with economic feasibility but with practical development and application of [nuclear] energy." And in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 550, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978), the Supreme Court cited section 274(k) for the proposition that "[t]here is little doubt that under the Atomic Energy Act of 1954, state public utility commissions or similar bodies are empowered to make the initial decision regarding the need for power . . . . The [Nuclear Regulatory] Commission's prime area of concern in the licensing context, on the other hand, is national security, public health, and safety." *See State ex rel. Utility Consumers Council v. Public Service Commission,* 562 S.W.2d 688, 698–99 (Mo.

---

**28.** Enactments since the passage of the Atomic Energy Act have given the states power to protect against radiation hazards in certain circumstances. *See* Clean Air Act Amendments of 1977, § 122, 42 U.S.C. § 7422 (Supp. III 1979) (radioactive emissions); NRC Authorization Act for Fiscal Year 1980, Pub.L.No.96–295, § 108(e) & (f), 94 Stat. 783 (1980) (plant siting). These provisions are discussed at pp. 926–928 *infra.*

**29.** State regulations which directly conflict with regulations of the NRC would, of course, be preempted even if they were enacted for purposes other than protection against radiation hazards. If the NRC required a nuclear plant to be constructed in a certain way for safety reasons, for example, a state could not require the plant to be constructed some other way for environmental reasons. *See New Jersey Dep't of Envir. Protection v. Jersey Central Power & Light Co.,* 69 N.J. 102, 351 A.2d 337 (1976).

**30.** More recently, two courts have held that the Atomic Energy Act of 1954 does authorize the NRC to consider environmental issues in its licensing proceedings. *Detroit Edison Co. v. United States Nuclear Regulatory Comm'n,* 630 F.2d 450, 453 (6th Cir. 1980); *Public Serv. Co. v. United States Nuclear Regulatory Comm'n,* 582 F.2d 77, 84–85 (1st Cir.), *cert. denied,* 439 U.S. 1046, 99 S.Ct. 721, 58 L.Ed.2d 705 (1978). Both courts recognized that the states had concurrent regulatory authority under sections 271 and 274(k) of the 1954 Act. *Detroit Edison Co.,* 630 F.2d at 453; *Public Serv. Co.,* 582 F.2d at 85.

App.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978) ("The federal government regulates *how* nuclear power plants will be constructed and maintained; the State of Missouri regulates *whether* they will be constructed.")

In concluding that Congress intended to preempt only regulation of radiological hazards, we join the only other circuit court to have considered the issue thus far. In *Northern States Power Co. v. Minnesota*, 447 F.2d 1143 (8th Cir. 1971), *aff'd mem.*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), the Eighth Circuit was faced with a Minnesota statute regulating the level of radioactive discharges from nuclear plants. The standards imposed by Minnesota paralleled federal standards, but were considerably more stringent. *Id.* at 1145. The court concluded that section 274 of the Atomic Energy Act of 1954 "demonstrates Congressional recognition that the AEC at that time possessed the sole authority to regulate radiation hazards associated with byproduct, source, and special nuclear materials and with production and utilization facilities." *Id.* at 1149. The court then went on to explain the effect of section 274(k):

The only logically acceptable reason for inclusion of subsection (k) within [section 274] was to make it clear that Congress was not, by subsection (c) of the 1959 amendment, in any way further limiting the power of the states to regulate activities, *other than radiation hazards*, associated with those areas over which the AEC was forbidden by that subsection to relinquish its control.

*Id.* at 1150 (emphasis in original).[31] Other courts which have considered the states' power to regulate nuclear plants have made a similar distinction, and have concluded that the Atomic Energy Act preempts only regulations directed at radiation hazards.[32]

### 2. The moratorium provision and the three-site requirement

 Since Congress intended to permit states to regulate "for purposes other than protection against radiation hazards," § 274(k), we must next inquire whether the California statutes at issue here are aimed at radiation hazards. We conclude that they are not.

*Marshall v. Consumers Power Co.*, 65 Mich. App. 237, 237 N.W.2d 266 (1975), involved a claim that a nuclear plant created a common-law nuisance. Reasoning that section 274 "preempts state action concerning radiological, but not nonradiological matters," 65 Mich.App. at 248, 237 N.W.2d at 275, the court held that it could not consider the plaintiff's allegations about the effectiveness of the plant's emergency core cooling system, but that it could consider allegations concerning steam, fog, and ice created by the plant's cooling pond.

Other courts have taken similar positions. *See Commonwealth Edison Co. v. Pollution Control Bd.*, 5 Ill.App.3d 800, 284 N.E.2d 342 (1972) (state statute regulating level of radioactive discharge is preempted); *State ex rel. Utility Consumers Council v. Public Serv. Comm'n*, 562 S.W.2d 688 (Mo.App.), *cert. denied*, 439 U.S. 866, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978) (state power to grant or deny certificate of public convenience and necessity is not preempted); *cf. New Jersey Dep't of Envir. Protection v. Jersey Central Power & Light Co.*, 69 N.J. 102, 351 A.2d 337 (1976) (state regulation conflicting with AEC regulation is preempted, but not all state regulation of nuclear plants for all purposes).

---

**31.** The Minnesota statute involved in *Northern States* was intended to protect against radiation hazards, and the court held that it was preempted. The court also held that the regulation at issue interfered with a congressional goal of promoting nuclear power. This aspect of the *Northern States* decision is discussed in note 39 *infra*.

**32.** In *United States v. City of New York*, 463 F.Supp. 604 (S.D.N.Y.1978), the court considered New York City's attempt to prohibit Columbia University from operating a research reactor within the city limits. The City's objection was based on the danger that an accidental release of radiation might occur. The court held that such "radiological regulation of the operation of nuclear reactors" was preempted under section 274. 463 F.Supp. at 612.

The court in *Northern Cal. Ass'n to Preserve Bodega Head and Harbor, Inc. v. Public Util. Comm'n*, 61 Cal.2d 126, 37 Cal.Rptr. 432, 390 P.2d 200 (1964), also considered the question of whether states could restrict the location of a nuclear reactor. The court held that the state could keep a reactor from being built in an earthquake zone, since "safety considerations in addition to radiation hazards" were involved. 61 Cal.2d at 133, 390 P.2d at 204, 37 Cal.Rptr. at 436.

The moratorium provision, Cal.Pub.Res. Code § 25524.2, was part of a legislative package [33] enacted as an alternative to a proposed voter initiative, Proposition 15. Proposition 15 would have ultimately barred any nuclear plants in California, unless (1) the federal limit on liability for nuclear accidents, 42 U.S.C. §§ 2012, 2014, 2073, 2210 (1976 & Supp. III 1979) (the Price-Anderson Act), was removed; (2) the California legislature determined reactor safety systems to be adequate; and (3) the California legislature determined that nuclear wastes could be stored without danger to the public. See Reassessment, supra note 33, at 159–63 (reprinting text of Proposition 15).

The California Assembly Committee on Resources, Land Use, and Energy, which proposed the package of bills that became the Nuclear Laws, published a lengthy report explaining Proposition 15 and contrasting it with the committee alternatives. Reassessment, supra note 33. Proposition 15 was intended to deal with a number of perceived problems with nuclear power, some safety-related and some economic. One major problem identified in the committee report was the lack of a federally approved method of disposing of nuclear wastes. The committee classified this as a "stipulated" problem, since representatives of industry and government, as well as critics of nuclear power, recognized the problem's existence. Id. at 2, 12. In addition, the committee classified the problem as "largely economic or the result of poor planning, not safety-related." Id. at 18 (emphasis in original). As the committee saw it, the lack of a federally approved method of waste disposal created a "clog" in the nuclear fuel cycle; more wastes were continually being produced, storage space was limited, and no permanent means of disposal was available. The committee noted that the costs of nuclear power were escalating sharply, and that "increasing disappointments in portions of the fuel cycle" were a contributing factor. Id. at 27–28. Several government witnesses testified that the continued development of nuclear power in the absence of a method of waste disposal was inadvisable. Id. at 18–21.

The safety considerations associated with nuclear waste disposal were viewed by the committee as quite a different problem, one on which industry representatives and nuclear critics largely disagreed. Id. at 3, 12–13. Critics of nuclear power believed that the methods of waste disposal being considered by the federal government would be inadequate to safeguard the wastes during the hundreds of years that they remained dangerous. The nuclear industry, on the other hand, believed that the methods of waste disposal being considered would prove adequate once the federal government had invested sufficient time and money in research and testing. See id. at 67–71.

Proposition 15 was designed to deal with both types of problems associated with nuclear waste disposal. The proposition would have banned nuclear plants unless the California legislature determined that nuclear wastes could be "stored or disposed of, with no reasonable chance . . . of intentional or unintentional escape of such wastes or radioactivity into the natural environment which will eventually adversely affect the land or the people of the State of California." Proposition 15, § 1 (proposed Cal.Gov. Code § 67503(b)(2)), reprinted in Reassessment, supra note 33, at 160. Thus, the California legislature would have had to make an independent judgment about whether a proposed method of waste disposal was safe.[34]

---

33. The package originally contained four bills. A.B. 2823, dealing with liability for nuclear accidents, was defeated by the Ways and Means Committee of the California Assembly. The remaining bills were enacted as sections 25524.1, 25524.2, and 25524.3 of the California Public Resources Code. California Assembly Committee on Resources, Land Use, and Ener-

gy, Reassessment of Nuclear Energy in California: A Policy Analysis of Proposition 15 and Its Alternatives 154 (1976) [hereinafter cited as Reassessment]; 1976 Cal.Stats. chs. 194, 196, 195.

34. We express no opinion on whether Proposition 15 or similar laws being considered by other states would be preempted by the Atomic

Section 25524.2, in contrast, was intended to deal only with the "stipulated" problem caused by the lack of any approved method of waste disposal. The committee explained that its bills were "designed to provide a pause in the deployment of nuclear power plants until [certain] problems which may 'clog' the nuclear fuel cycle are resolved." *Reassessment, supra* note 33, at 154–55. One of the "major distinguishing features" differentiating Proposition 15 and the committee bills was that "[w]aste disposal *safety* is not directly addressed by the bills, which ask only that a method be chosen and accepted by the federal government." *Id.* at 156 (emphasis in original).

As the committee report makes clear, section 25524.2 is directed towards purposes other than protection against radiation hazards. While Proposition 15 would have required California to judge the safety of a proposed method of waste disposal, section 25524.2 leaves that judgment to the federal government. California is concerned not with the adequacy of the method, but rather with its existence.[35]

Until a method of waste disposal is approved by the federal government, California has reason to believe that uncertainties in the nuclear fuel cycle make nuclear power an uneconomical and uncertain source of energy. The legislature has chosen to mandate reliance upon other energy sources until these uncertainties associated with nuclear power are resolved. We find that such a choice is expressly authorized under sections 271 and 274(k) of the Atomic Energy Act of 1954.

The requirement that utilities submit three alternate sites for their proposed plants, Cal.Pub.Res.Code §§ 25503, 25504, 25516, is also unrelated to protection against radiation hazards. The requirement applies to all power plants, nuclear and non-nuclear. It provides California with an efficient means of deciding where a proposed power plant should be located. Such decisions have been regarded as within the states' authority, for nuclear as well as other power plants. During hearings on section 274 of the Atomic Energy Act, it was agreed that state and municipal zoning regulations (establishing, for example, residential, commercial, or industrial zones) would apply to nuclear plants. *Federal-State Relationships, supra* note 27, at 494 (remarks of Rep. Price & Sen. Hickenlooper). The AEC's general manager pointed out that section 274(k) would permit the courts latitude in sustaining "certain types of zoning requirements which have purposes other than control of radiation hazards, even though such requirements might have an incidental effect upon the use of ... nuclear materials licenses [sic] by the Commission." Letter from A. R. Luedecke to Sen. Clinton P. Anderson, *reprinted in Federal-State Relationships, supra* note 27, at 500. More recently, Congress passed legislation explicitly recognizing the states' authority to impose "requirement[s] relating to land use or respecting the siting" of nuclear plants. NRC Authorization Act for Fiscal Year 1980, Pub.L.No.96–295, § 108(f), 94 Stat. 780 (1980).

Energy Act. *Compare, e. g.,* Murphy & La Pierre, *Nuclear "Moratorium" Legislation in the States and the Supremacy Clause: A Case of Express Preemption,* 76 Colum.L.Rev. 392 (1976), *with* Barton & Meyers, *The Legal and Political Effects of the California Nuclear Initiative,* in The California Nuclear Initiative 1, 23–26 (1976), *and* Wiggins, *Federalism Balancing and the Burger Court: California's Nuclear Law as a Preemption Case Study,* 13 U.C. Davis L.Rev. 1, 60–86 (1979–80).

**35.** Section 25524.2(b) does permit the California legislature to "disaffirm" an Energy Commission finding that a federally approved method of waste disposal exists. It is not clear whether this provision would permit California to disapprove a method of waste disposal that

the NRC had approved. Such a possibility need not concern us here, however. In applying preemption analysis, we "distinguish those situations in which the concurrent exercise of a power by the Federal Government and the States or by the States alone *may possibly* lead to conflicts and those situations where conflicts *will necessarily* arise." *Goldstein v. California,* 412 U.S. 546, 554, 93 S.Ct. 2303, 2308, 37 L.Ed.2d 163 (1973) (emphasis in original). There is no necessary conflict between section 25524.2 and federal law, and it will be time to consider any future conflicts if and when they arise. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 237, 67 S.Ct. 1146, 1155–56, 91 L.Ed. 1447 (1947).

California has chosen to determine site suitability on a case-by-case basis rather than through zoning laws. The NRC has itself recognized that states "retain the right, even in the face of the issuance of an NRC construction permit, to preclude construction on such bases as . . . the environmental unacceptability of the proposed facility or site." *Consolidated Edison Company of New York, Inc. (Indian Point Station, Unit No. 2)*, ALAB–453, 7 N.R.C. 31, 34 (1978). California's requirement that utilities submit three alternate sites simply makes the state's suitability determination more efficient. We hold that the Atomic Energy Act does not prevent California from imposing such a requirement.

### C. Conflict with Federal Purposes and Objectives

Even though we conclude that Congress did not intend to preempt state regulations of the type at issue here, the regulations would nonetheless be preempted if they actually conflicted with federal law. As noted above, a conflict would arise if compliance with both federal and state regulations were impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963), or if the state regulations stood as an obstacle to achievement of congressional objectives, *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Compliance with both federal and California laws is possible in the present case, but the utilities contend that the California laws impermissibly interfere with a federal goal of promoting nuclear power.

The utilities argue that the introductory sections of the Atomic Energy Act of 1954, §§ 1–3, 42 U.S.C. §§ 2011–2013 (1976), establish a "Congressional policy to promote the private development of nuclear power plants." These provisions do express Congress's intent to encourage private industry to enter the nuclear field. *E. g.*, § 3(d), 42 U.S.C. § 2013. They also express Con-

gress's intent that the development of nuclear power be "directed so as to promote world peace, improve the general welfare, increase the standard of living, and strengthen free competition in private enterprise." § 1, 42 U.S.C. § 2011. In these objectives we do not find an intent to promote nuclear power at all costs.

The Supreme Court has cautioned that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981) (quoting *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)). Viewing the Atomic Energy Act of 1954 as a whole, we find that Congress struck a balance between state and federal power to regulate.[36] Inherent in the states' regulatory authority is the power to keep nuclear plants from being built, if the plants are inconsistent with the states' power needs, or environmental or other interests. Encompassed in the state's power to enforce zoning laws is the power to deny land use to a nuclear plant. A part of the state's power to issue certificates of public convenience and necessity is the power to deny certification for an unnecessary or uneconomic nuclear plant. These state powers, recognized by sections 271 and 274(k), are inconsistent with a congressional goal of promoting nuclear power at all costs.

In any event, legislation since the passage of the 1954 Act evidences a change in congressional outlook. The Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801–5891 (1976), restructured the federal regulation of nuclear power by transferring the AEC's regulatory functions to the NRC and its promotional functions to the Energy Research and Development Administration

---

**36.** As our previous discussion of sections 271 and 274(k) demonstrates, *see* pp. 920–922 *supra*, Congress recognized that the states would regulate nuclear plants in certain respects.

(ERDA).[37] ERDA was directed to develop all sources of energy, including nuclear, but only "consistent with warranted priorities." 42 U.S.C. § 5801(b). The report accompanying the Reorganization Act explains that this provision was inserted in response to "deep concerns regarding the possibility of a pro-nuclear bias in ERDA." S.Rep.No. 93–980, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 5470, 5476; *see id.* at 5489. ERDA was expected to "place greater relative emphasis on non-nuclear energy." *Id.* at 5480. Congress also passed the Federal Nonnuclear Energy Research and Development Act of 1974, 42 U.S.C. §§ 5901–5917 (1976), directing ERDA to develop "a comprehensive nonnuclear energy research, development, and demonstration program." 42 U.S.C. § 5905(b)(1).

Congress's balanced approach to nuclear power development is further demonstrated by several acts explicitly permitting states to regulate nuclear plants. The Clean Air Act Amendments of 1977, § 122, 42 U.S.C. § 7422 (Supp. III 1979), give states the authority to regulate radioactive air emissions from nuclear plants. States may, if they wish, establish emission standards more stringent than those imposed by the NRC. 42 U.S.C. § 7416; H.R.Conf.Rep.No. 95–564, 95th Cong., 1st Sess. 143, *reprinted in* [1977] U.S.Code Cong. & Ad.News 1502, 1523–24.[38] Congress recognized that state emission standards might prove burdensome for utilities intending to construct nuclear plants, but concluded that "[t]he costs of protecting the public health . . . must be considered a cost of doing business for the nuclear power industry." H.R.Rep.No.95–294, 95th Cong., 1st Sess. 43, *reprinted in* [1977] U.S.Code Cong. & Ad.News 1077, 1121. The NRC has agreed that a state could, under the authority of the Clean Air Act Amendments of 1977, prevent nuclear plants from being built at all. *E. g., Consolidated Edison Company of New York, Inc. (Indian Point Station, Unit No. 2),* ALAB–453, 7 N.R.C. 31, 34 & n.13 (1978). Finally, the NRC Authorization Act for Fiscal Year 1980, Pub.L.No.96–295, 94 Stat. 780 (1980), recognizes the states' authority to set nuclear plant siting and land use requirements more stringent than those of the NRC. *Id.* § 108(f). The Authorization Act also makes issuance of an NRC operating license contingent upon state adoption of plans for responding to nuclear emergencies. *Id.* § 109(a). In light of these demonstrated congressional concerns, we cannot conclude that the California laws at issue here present an obstacle to congressional goals.[39]

---

**37.** ERDA's functions were later transferred to the Department of Energy. 42 U.S.C. § 7151(a) (Supp. III 1979).

**38.** The Clean Air Act Amendments of 1977 were intended to overturn the holding of *Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir. 1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), in the specific context of regulation of radioactive air pollutants. *See* H.R.Rep.No.95–294, 95th Cong., 1st Sess. 43 n.8, *reprinted in* [1977] U.S.Code Cong. & Ad.News 1077, 1121 n. 8; H.R.Conf.Rep.No.95–564, 95th Cong., 1st Sess. 143, *reprinted in* [1977] U.S.Code Cong. & Ad. News 1502, 1523–24.

**39.** *Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir. 1971), *aff'd mem.,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972), is not to the contrary. The *Northern States* court had before it a statute which regulated radioactive hazards, an area that was at the time clearly preempted by the Atomic Energy Act. The court thus had no occasion to consider state regulations for other purposes. The court stated in dicta that if states were allowed to regulate, "they might conceivably be so overprotective in the area of health and safety as to unnecessarily stultify the industrial development and use of atomic energy." *Id.* at 1153–54. *Northern States* does not, however, hold that states may *never* take actions which "stultify the . . . use of atomic energy." The Supreme Court has since suggested that the result in *Northern States* would have been different if the state had been regulating thermal pollution rather than radioactive emissions. *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 16–17 & n. 14, 96 S.Ct. 1938, 1945–46 & n.14, 48 L.Ed.2d 434 (1976); *see Marshall v. Consumers Power Co.,* 65 Mich.App. 237, 253–54, 237 N.W.2d 266, 277–78 (1975).

*First Iowa Hydro-Elec. Coop. v. Federal Power Comm'n,* 328 U.S. 152, 66 S.Ct. 906, 90 L.Ed. 1143 (1946), is also not to the contrary. In *First Iowa,* the Supreme Court held that a utility could not be required to obtain a state permit before building a dam to be licensed by the Federal Power Commission. The Court found the state permit requirement impermissible be-

The Supreme Court has held that federal regulation "should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that Congress has unmistakably so ordained." *De Canas v. Bica*, 424 U.S. 351, 356, 96 S.Ct. 933, 937, 47 L.Ed.2d 43 (1976) (quoting *Florida Lime*, 373 U.S. at 142, 83 S.Ct. at 1217). Here, the Atomic Energy Act of 1954 and the other federal statutes we have discussed establish a careful balance between the regulatory responsibilities of the federal government and the states. Congress has not "unmistakably . . . ordained" a goal of promoting nuclear power, but has instead regarded nuclear power as one option which the states may choose.

In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), the Supreme Court noted that "[t]ime may prove wrong the decision to develop nuclear energy, but it is Congress or the States within their appropriate agencies which must eventually make that judgment." California has made a judgment only that, for the moment, there should be a moratorium on the construction of new nuclear plants. Because California's moratorium provision and the three-site requirement do not fall within the area reserved to the NRC's regulatory authority under the Atomic Energy Act of 1954, and because they do not impede congressional goals, we hold that they are not preempted.

The grant of summary judgment in Nos. 79–3365 and 79–3382 (the *PLF* case) is REVERSED, and the case is REMANDED for trial or for other proceedings consistent with this opinion. The judgment in Nos. 80–4265 and 80–4273 (the *PG&E* case) is REVERSED.

FERGUSON, Circuit Judge, concurring:

While I concur in the disposition reached in regard to the merits of the plaintiffs' preemption claims, I write separately because Congress has not granted a private cause of action to the plaintiffs.

The majority opinion correctly analyzes the standing of each of the plaintiffs to prosecute these lawsuits in terms of the familiar indicia of particularized injury, causation, and the court's capacity to provide redress. It does not, however, address the related question of whether Congress, in enacting the Atomic Energy Act, intended that private entities such as these plaintiffs be empowered to bring lawsuits seeking to impose on the states their own interpretations of the Act. It is my opinion that none of the plaintiffs have any enforcement rights pertaining to the provisions of the Atomic Energy Act.[1]

The plaintiffs in the two cases involved in these appeals seek a judicial determination that various California statutes are unconstitutional, as violations of the Supremacy

---

cause the Federal Water Power Act specifically gave the FPC responsibility for "a comprehensive plan for improving or developing a waterway or waterways for . . . beneficial public uses." 16 U.S.C. § 803(a); *First Iowa*, 328 U.S. at 160 n. 5, 164 & n. 9, 66 S.Ct. at 909–10 n. 5, 911 & n. 9. As we have discussed in the text, the Atomic Energy Act gives the NRC no such comprehensive planning responsibility. The fact that a nuclear power plant has met federal standards and obtained a federal license does not of itself prevent the state from imposing additional standards. *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 164, 168–69, 98 S.Ct. 988, 997, 999–1000, 55 L.Ed.2d 179 (1978); *Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 447, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960).

1. At one time, the lack of such an enforcement right was considered to be a bar to Article III

standing. *See, e. g., Alabama Power Co. v. Ickes*, 302 U.S. 464, 479, 58 S.Ct. 300, 303, 82 L.Ed. 374 (1938). That restrictive view of standing has now been discarded.

> The "legal interest" test goes to the merits. The question of standing is different. It concerns, apart from the "case" or "controversy" test, the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.

*Ass'n of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 108 (1970). *See also Barlow v. Collins*, 397 U.S. 159, 168, 90 S.Ct. 832, 838, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result and dissenting).

Clause. The Supremacy Clause itself, of course, grants no substantive rights, and a litigant who claims its protection must be able to point to another source for the substantive right—the right to relief—he asserts in his cause of action. These principles are highlighted by recent observations of the Supreme Court in *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 612–15, 99 S.Ct. 1905, 1913–15, 60 L.Ed.2d 508 (1979). The question before the Court in *Chapman* was the reach of the jurisdictional grant in 28 U.S.C. § 1343(3), which covers civil suits for the redress of deprivations of rights, privileges, or immunities secured by the Constitution or by a federal law providing for equal rights. The Court observed that

> the first propositional phrase ["secured by the Constitution"] can be fairly read to describe rights secured by the Supremacy Clause. For even though that Clause is not a source of any federal rights, it does "secure" federal rights whenever they come into conflict with state law. In that sense all federal rights, whether created by treaty, by statute, or by regulation, are "secured" by the Supremacy Clause.

*Id.* at 613, 99 S.Ct. at 1913. The Court concluded, however, that

> [i]n order to give meaning to the entire statute as written by Congress, we must conclude that an allegation of incompatibility between federal and state statutes and regulations does not, in itself, give rise to a claim "secured by the Constitution" within the meaning of § 1343(3).

*Id.* at 615, 99 S.Ct. at 1914–15.

The conclusion is thus compelled that the right to relief claimed by the plaintiffs here, although "secured" by the Supremacy Clause, must originate in the Atomic Energy Act itself. We must therefore look to that Act, and to the guiding principles of statutory construction, to discern whether Congress intended to grant, explicitly or implicitly, any such right to relief to these or similarly placed plaintiffs.[2]

When a plaintiff seeks to challenge federal agency action, the court must "canvass relevant statutory materials," in order to determine "whether Congress meant to deny or to allow judicial review of the agency action at the instance of the plaintiff." *Barlow v. Collins*, 397 U.S. 159, 169, 90 S.Ct. 832, 839, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in the result and dissenting). Similarly, when a plaintiff seeks to complain of state action, including state legislative action, on the strength of assertedly preemptive federal statutes, the court must consider whether Congress intended that that plaintiff be authorized to seek relief through judicial action.

*Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), involved the question of whether New York welfare legislation was inconsistent with provisions of the Social Security Act. Justice Black, dissenting, argued that the District Court should not have entertained the lawsuit, because HEW had not had the opportunity to exercise its own judgment on the underlying question of compatibility of the state and federal statutes:

> I think it will be impossible for HEW to fulfill its function under the Social Security Act if its proceedings can be disrupted and its authority undercut by courts which rush to make precisely the same determination that the agency is directed by the Act to make. And in instances when HEW is confronted with a particu-

---

2. My research has disclosed no case which stands as direct precedent for the position taken in the text. Indeed, in a number of more or less analogous contexts, the Supreme Court has reached the merits of preemption claims brought by private litigants without consideration of the questions I raise here. *See, e. g., Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *City of Burbank v. Lockheed Air Terminal*, 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *Askew v. American Waterways Operators, Inc.*, 411 U.S.

325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). In such cases, essentially, the courts are allowing the private litigants to act in the capacity of private attorneys general, and in many, perhaps most, contexts, this practice will serve the public interest. Whether the same can be said in the area of nuclear power regulation is a question which should not be disposed of merely by analogy to other areas of federal regulation. Rather, a searching and independent analysis is called for.

larly sensitive question, the agency might be delighted to be able to pass on to the courts its statutory responsibility to decide the question. In the long run, then, judicial pre-emption of the agency's rightful responsibility can only lead to the collapse of the enforcement scheme envisioned by Congress, and I fear that this case and others have carried such a process well along its way.

*Id.* at 434–35, 90 S.Ct. at 1228–29. In the statutory context of *Rosado*, the Supreme Court considered and rejected the applicability of the reasoning offered by Justice Black and quoted above. The present lawsuits arise in a different statutory and regulatory context, in which I believe that reasoning parallel to Justice Black's should be applied.[3]

As a starting point, we may observe that nowhere in the Atomic Energy Act has Congress explicitly authorized lawsuits such as the ones before us. At the same time, the grant of powers in 42 U.S.C. § 2201(i) (1976) is clearly broad enough to enable the Nuclear Regulatory Commission to pass judgment on such questions as those presented here: "[T]he Commission is authorized to . . . (i) prescribe such regulations or orders as it may deem necessary . . . (3) to govern any activity authorized pursuant to this chapter."

Even though the Atomic Energy Act does not explicitly authorize private actions to enforce its provisions in the face of conflicting state statutes, and even though it does empower the Nuclear Regulatory Commission to deal appropriately, within its discretion, with such conflicts, it might be thought that there is nevertheless an *implied* private right of action under the Act.

In *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Supreme Court refused to consider whether the defendant had violated the federal statute sued under, because it found that Congress had not intended to provide any private remedy for its violation, either explicitly or implicitly. The principles enunciated in *Cort* were quite recently reiterated in *California v. Sierra Club,* —— U.S. ——, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). That case, which makes it clear that the critical question is *not* whether a party would benefit from a particular statute, but whether Congress intended to confer an enforcement right on that party, is dispositive here.

There is nothing on the face of the statute or in its legislative history which suggests that Congress intended to confer rights upon the plaintiffs in these actions.

The Atomic Energy Act, like the Rivers and Harbors Appropriations Act of 1899, as interpreted in *California v. Sierra Club, supra:*

1. Does not carry any implication of an intention to confer rights on a particular class of persons.

2. Was designed to benefit the public at large.

3. Was designed to enable the Nuclear Regulatory Commission to carry out the terms, duties, and responsibilities of the Act.

4. Demonstrates that Congress was not concerned with private rights but with the federal government's ability to respond to atomic energy problems.

I submit that Congress has decided that only the Nuclear Regulatory Commission, and not the plaintiffs, may challenge California statutes as being preempted by the Act. Of course, a party which is aggrieved by a final action of the Nuclear Regulatory Commission may have a cause of action for judicial review of that action under the Administrative Procedures Act. 5 U.S.C. § 702 (1976). But that is not the posture in which these cases arise.

Finally, *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), is not

---

**3.** *Northern States Power Company v. State of Minnesota,* 447 F.2d 1143 (8th Cir. 1971), also involved the issue of federal preemption, by the Atomic Energy Act, of state regulation of nuclear power plants. The opinion impliedly holds that Congress has empowered private plaintiffs to bring suits for declaratory relief in this area. It is not persuasive on the point, however, since it does not discuss, or even mention, the need for Congressional authorization of such suits.

to the contrary. The issue in *Duke Power* was whether private parties had standing to challenge the constitutionality of a section of the Atomic Energy Act. Here, the plaintiffs are claiming enforcement rights under the Act. The issues are quite different, and the tests which govern the disposition of those issues are correspondingly different. Standing to challenge the constitutionality of a statute does not in itself confer enforcement rights under that statute.

Congress has recognized that the future of this nation depends on our collective ability to contain safely nuclear energy. Because the public interest is paramount, a Nuclear Regulatory Commission has been established to oversee the statutory scheme. That Commission's oversight is clearly intended to be comprehensive, and the Congressional goal of bringing to the field of nuclear energy a single, expert, public agency to interpret and carry out the provisions of the Atomic Energy Act is frustrated when individual courts, at the instance of private entities, pass judgment on the scope of that Act. The regulatory plan which Congress so carefully devised cannot be upset by the judicial action sought in cases such as these.